UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
-------------------------------------------------x
                                                 :
HENKEL OF AMERICA, INC.          :    3: 18 CV 965 (JAM)
                                                 :
v.                                               :
                                                 :
RELIASTAR LIFE INS. CO. ET AL    :    DATE: DEC. 6, 2019
                                                 :
                                                 :
-------------------------------------------------x
```

RULING ON PENDING DISCOVERY MOTIONS (DOC. NOS. 80, 89, 95, 105 & 109)

The plaintiff, Henkel of America, Inc. ["Henkel"], provides health benefits to its employees and their dependents through a self-funded group health plan with stop loss insurance from defendant ReliaStar Life Insurance Company ["ReliaStar"]. Pursuant to the plan, Henkel designated Aetna Life Insurance Company as the claims administrator for medical benefits and Express Scripts Inc. ["ESI"] as the claims administrator for prescription drug benefits. ReliaStar performed an audit of certain prescription drug benefits paid pursuant to Henkel's health benefit plan, following which ReliaStar denied coverage for more than $47 million dollars in health claims paid by Henkel.[1]

Pending before the Court are a series of discovery motions which fall into two broad categories: (1) motions related to ESI's alleged conflict of interest; and, (2) motions related to the deposition of treating providers of the underlying insureds. (*See* Doc. No. 104 (referral order to the undersigned for all discovery)). In the first category, the following motions are pending: (1)

---

[1]Specifically, in 2017, ReliaStar hired an outside consultant, Optum Healthcare ["Optum"], to assess the Plan's coverage determinations with respect to the two participants' treatments for which Henkel sought excess loss coverage by ReliaStar. (Doc. No. 56 at 4). Following Optum's conclusion that none of the expenses incurred should have been covered by the Plan because the treatments were "experimental and investigational[,]" ReliaStar denied its obligation to reimburse Henkel under the stop-loss policy, which cost Henkel more than $47 million in unreimbursed claims. (Doc. No. 56 at 4).

Defendant ESI's Motion to Quash Subpoenas to Third Parties (Doc. No. 80; *see also* Doc. Nos. 81-83, 98, 101-02, 115); (2) Defendant ReliaStar's Motion to Compel (Doc. No. 89; *see also* Doc. Nos. 91-92, 109, 117); and, (3) Non-Party Takeda Pharmaceuticals International, Inc.'s Motion to Quash Subpoenas and For Joinder to ESI's Motion to Quash (Doc. No. 107; *see also* Doc. No. 119). In the second category, the following motions are pending: (1) Movants Dr. Henry Kanarek and the Duffins' Motion to Quash Deposition Subpoena and Stay Deposition of Dr. Kanarek (Doc. No. 95; *see also* Doc. Nos. 111-12, 123); and, (2) Movants Dr. Mark Neustrom and the Duffins' Motion to Quash Deposition Subpoena and Stay Deposition of Dr. Neustrom (Doc. No. 105; *see also* Doc. Nos. 118, 124). The Court held a telephonic discovery conference on November 8, 2019 (Doc. Nos. 108, 116); the parties completed briefing on the pending motions on December 2, 2019.

In all of the motions, the parties rely on the Court's language regarding the scope of discovery as set forth in the March 28, 2019 Ruling on Henkel's Motion for Judgment on the Pleadings ["March Ruling"]. (Doc. No. 47). Accordingly, the proper starting point to address the discovery appropriate in this case is the Court's analysis in its March Ruling.

    A.    <u>THE MARCH 28, 2019 RULING</u>

In August 2018, Henkel moved for judgment on the pleadings, seeking a declaration that, under the plain language of the stop loss insurance policy, ReliaStar did not have the right to make underlying benefit determinations, overrule the determinations of the fiduciary claims administrators, or deny coverage on the basis of its assertion that an employee's treatment was experimental or investigational. The March Ruling identified the "[t]he real question" in this case as "not whether ReliaStar would have reached the same conclusion as the plan administrators[,]" but rather "[t]o what standard must the plan administrators be held?" (Doc. No. 47 at 2). In identifying that issue, the Court observed that ReliaStar had neither "the right to "veto" the plan

administrators' determinations merely because ReliaStar disagree[d] with such determination[,]" nor the obligation to pay for coverage "without question." (*Id.*).

Relying on *Computer Aided Design Sys. v. Safeco Life Ins. Co.*, 235 F. Supp. 2d 1052, 1059 (S.D. Iowa 2002), the Court noted a plan administrator's authority is defined by a benefits plan, and then, once consideration is given to the language of the plan, the court looks to an abuse of discretion standard "applicable to the typical ERISA case, where a plan beneficiary challenges the actions of the administrator." (Doc. No. 47 at 3). In *Computer Aided Design Sys.*, the court explained that "providing an excess loss insurance company[,]" like ReliaStar in this case, "with the unfettered power to control a plan administrator's decision making process by promising to withhold payment or by making post hoc coverage decisions" runs "afoul of ERISA and public policy, and is most definitely unreasonable." *Id.*, 235 F. Supp. 2d at 1059. Accordingly, the March Ruling defined the applicable standard in this case as the discretionary standard of "'whether a reasonable person, given the evidence presented in the administrative record, could have reached the same decision, not whether the reasonable person would have reached a like decision.'" (Doc. No. 47 at 3 (quoting *Computer Aided Design Sys.*, 235 F. Supp. 2d at 1061)). Stated another way, the excess loss insurance company, in this case ReliaStar, would be bound by the actions of the plan administrator absent an abuse of discretion.

"To ascertain the reasonableness of the plan administrator's factual review and application of the plan language in making a coverage decision, the Court looks to whether the decision was supported by substantial evidence[,]" which, in *Computer Aided Design Sys.*, involved looking at the information that the plan administrator had at the time the claim was processed, including the information submitted by the insured, the review by the independent medical review/utilization service and the third-party administrator, and the contradictory opinions submitted by the excess

3

loss insurer. *Computer Aided Design Sys.*, 235 F. Supp. 2d at 1061 (citation omitted). With this legal standard articulated, the March Ruling concluded that the parties should conduct "additional discovery into whether the administrators' decisions in this case were supported by substantial evidence." (Doc. No. 47, at 4) (citing *Hobson v. Metropolitan Life Ins. Co.*, 574 F.3d 75, 82 (2d Cir. 2009)).

The Court's reliance on the Second Circuit's decision in *Hobson* sheds light on the scope of discovery it intended to permit in this case. In *Hobson*, the insured brought an action against Metropolitan Life ["MetLife"] as the ERISA plan administrator, challenging the denial of her claim for long term disability benefits. *Hobson*, 574 F.3d at 78. Hobson alleged that MetLife's conflict of interest as both evaluator and payor of benefit claims influenced its decision to deny her claim for benefits. *Id.* The district court granted summary judgment for MetLife and denied Hobson's cross-motion for summary judgment, and the appeal followed. *Id.*

The Second Circuit explained that, despite Hobson's claim of a conflict of interest, the district court still had to defer to the administrator's decision, unless the decision was arbitrary and capricious, as the "deference given to the administrator does not change unless the plaintiff shows that the administrator was, in fact, influenced by the conflict of interest." *Id.* at 83 (citation and internal quotations omitted). To determine whether the administrator was influenced by a conflict of interest, the court must "(1) discuss the evidence allegedly showing that MetLife's conflict of interest influenced its decision-making, (2) determine what role MetLife's conflict of interest may have played in its decision, and (3) give that conflict any weight, as required by [*Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 128 (2008)]." *Id.* (citing *McCauley v. First Unum Life Ins. Co.*, 551 F.3d 126, 116 (2d Cir. 2008)). Thus, under *Hobson*, discovery into an alleged conflict of interest would be necessary because it would shed light on what role the alleged conflict of interest

had, if any, in the decision to deny or grant – in this case, grant– benefits, and what weight the conflict deserves.

In *Glenn*, the United States Supreme Court articulated a new standard applicable to the review of an administrator's decision when a plaintiff proves both that a conflict of interest exists and that this conflict affected the reasonableness of the administrator's discretionary decision. *See Glenn*, 554 U.S. at 110-11. "Following *Glenn*, a plan under which an administrator both evaluates and pays benefits claims creates the kind of conflict of interest that courts must take into account and weigh as a factor in determining whether there was an abuse of discretion[.]" *McCauley*, 551 F.3d at 133 (citing *Glenn*, 554 U.S. at 111). Under such circumstances, however, *de novo* review is not appropriate. *Id.* As the Supreme Court explained, evaluator/payor conflicts are "but one factor among many that a reviewing judge" must take into account when considering benefit decisions. *Glenn*, 554 U.S. at 116. The weight assigned to the conflict of interest "will change according to the evidence presented[,]" *McCauley*, 551 F.3d at 133, proving "more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." *Glenn*, 554 U.S. at 117 (citation omitted). Conversely, the issue of a conflict of interest "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decision[-]making irrespective of whom the inaccuracy benefits." *Id.* (citations omitted). Thus, discovery into a potential conflict of interest is necessary.

In *Hobson*, the court looked at the underlying documents evidencing the purported conflict of interest before declining to afford MetLife's conflict of interest any weight in its review of MetLife's benefit denial. *Hobson*, 574 F.3d at 83. The court then reviewed the administrator's decision under the "narrow" arbitrary and capricious standard of review under which a court may overturn a plan administrator's decision "only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law." *Id.* at 83-86. The court concluded that, in light of the substantial evidence supporting the denial of its claim, the denial of benefits was not arbitrary and capricious. *Id.* at 92.

In this case, the Court, in the March Ruling, limited discovery to: "(1) the administrators' authority under Henkel's healthcare plan, and (2) whether the authority was abused." (Doc. No. 47 at 4). Discovery into the role of those with authority under the plan, therefore, is necessary, and, following the *Hobson* and *Glenn* decisions, discovery into a purported conflict of interest is likewise appropriate. ESI, however, contends that Henkel has not asserted any claims of alleged conflict of interest, and thus, discovery is limited to ESI's authority to approve the claims at issue and whether ESI properly exercised its authority in approving those claims. (Doc. No. 80-1 at 4-5).

With this backdrop, the Court turns to the allegations in the Amended Complaint and the pending motions. On April 26, 2019, Henkel filed its First Amended Complaint against ReliaStar and brought additional claims against ESI as a named defendant. (Doc. No. 56). Specifically, with respect to ESI, Henkel alleged that ESI breached its fiduciary duty under ERISA (Count IV) or the common law (Count V). (*Id.*). ESI filed a motion to dismiss, which Henkel opposed. (Doc. Nos. 61, 70 and 72).[2]

---

[2] ESI's motion to dismiss (Doc. No. 61) is pending before the Court (Meyer, J.).

In the Second Amended Complaint, Henkel alleges that, under the March Ruling, if ReliaStar is relieved of its coverage obligations under the stop-loss policy, it is because ESI [and its subsidiary Accredo[3]], which was delegated discretionary authority as the Plan fiduciary with respect to the administration of the prescription drug benefits under the Plan, "abused its discretion in approving the disputed prescription drug claims. If that's the case, then ESI breached its fiduciary duties owed to the Plan and its participants as a claim administrator." (Doc. No. 56 at 5). Thus, Henkel alleges that "in the alternative to its claim against ReliaStar, Henkel, as sponsor of the Plan and as a fiduciary of the Plan and in representative capacity on behalf of the Plan, seeks reimbursement from ESI to restore the Plan for the prescription drug benefits ESI approved on behalf of the Participants[.]" (*Id.*).

B. <u>MOTIONS REGARDING FINANCIAL INTEREST (DOC. NOS. 80, 89 & 107)</u>

In June 2019, ReliaStar served discovery requests on ESI and Accredo seeking the production of documents related to rebate and financial information. (*See* Doc. No. 93, Exs. A-E). ESI and Accredo objected to these requests on grounds that the information was irrelevant and highly confidential.

In September 2019, ReliaStar issued subpoenas on the four pharmaceutical manufacturers who manufactured the drugs at issue: CSL Behring; Pharming Healthcare, Inc.; Shire US, Inc.; and Takeda Pharmaceuticals [collectively "the Drug Manufacturers"]. (Doc. No. 80, Ex. 6). On October 4, 2019, ESI moved to quash the subpoenas issued to the Drug Manufacturers because they sought the production of ESI's "highly confidential and proprietary trade secrets, and the risk of the disclosure of those materials highly outweighs ReliaStar's need for the documents, which are completely irrelevant to any claim or defenses remaining in this case." (Doc. No. 80 at 1). On

---

[3] Accredo Group Health, Inc. and Accredo Health, Inc. are collectively referred to as "Accredo."

October 31, 2019, Non-Party Takeda Pharmaceuticals moved to quash the ReliaStar's subpoenas. (Doc. No. 107).[4]

Ten days later, ReliaStar moved to compel ESI and Accredo to produce documents and information responsive to its June 2019 discovery requests. (Doc. No. 89). Specifically, ReliaStar seeks production of responses to its Request for Production Nos. 2-7, Interrogatory Nos. 6-9 and 12-13, and Request for Production Nos 4-8 in the subpoena directed to Accredo (Doc. No. 89), which ESI has objected to on relevancy grounds and because such information is highly proprietary.

### 1. RELEVANCY ARGUMENTS – THE DISCOVERY SOUGHT FALLS WITHIN THE DIRECTIVE OF THE MARCH RULING

ESI argues that the information sought has "no connection to the two narrow issues that the Court has ordered are open for discovery." (Doc. No. 81-1 at 2). ESI claims that its authority under its contract with Henkel was limited to adjudicating claims for prescription drugs that were covered benefits under the Henkel Plan. (Doc. No. 80-1 at 5). The drugs were covered by the Plan if they met specific prior authorization criteria, and ESI's authority was limited to determining whether the specific prior authorization criteria was met before approving payment. (Doc. No. 80-1 at 5). Thus, ESI urges that it had no discretionary authority under the Plan. (*Id.*). ESI argues that, in addition to the highly proprietary nature of the documents and information sought, this discovery does not fall within the two limited areas of discovery permitted under the March Ruling: discovery into the administrators' authority under the Henkel Plan, and discovery into whether that authority was abused.

---

[4] Takeda Pharmaceuticals "recently acquired Shire"; its Motion to Quash, therefore, addresses the subpoenas served on both Takeda and Shire. (Doc. No. 107 at 1 n.3).

ReliaStar argues, conversely, that the Court will ultimately decide whether ESI abused its discretion or otherwise violated its duties to the Henkel Plan, and such a decision turns on whether ESI's dual role as a plan administrator with a financial interest in the outcome of the participants' claims, created a conflict of interest giving rise or contributing to an abuse of discretion. (Doc. No. 89-1 at 2). Although ESI has moved to dismiss the claims against it, Henkel has alleged a breach of fiduciary duty by ESI under ERISA and under common law, and that ESI was operating under a conflict of interest. In particular, Henkel claims:

> 235. By accepting payments for approved claims and acting as set forth above, ESI acted without regard as to whether its conduct would be detrimental to Henkel.
>
> 236. ESI breached its fiduciary duties to Henkel by the acts of self-dealing and other wrongful conduct detailed above, and Henkel has consequently been damaged.

(Doc. No. 56 ¶¶ 235-26).

At this stage in the case, as made evident by ESI's briefing on its Motion to Dismiss, there is a fundamental disagreement between ESI and Henkel as to ESI's duties and responsibilities under the Henkel Plan. Those duties and responsibilities are relevant. ReliaStar is entitled to discovery into ESI's authority, and whether, after it authorized use of the pharmaceuticals at issue, it then acted as an intermediary in the resale of those same pharmaceuticals back to the Henkel Plan, with its subsidiary, Accredo, being paid substantial sums for the pharmaceuticals that ESI approved in the first place. It is well-established that parties may "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and is proportional to the needs of the case[.]" FED. R. CIV. P. 26(b)(1).

ReliaStar seeks to compel responses to its Requests for Production Nos. 2-7 and Interrogatory Nos. 6-9 and 12-13 directed to ESI, in which ReliaStar asks for

> documents and communications relating to any direct or indirect compensation received by or paid to ESI or Accredo, including without limitation, rebates, discounts and other financial incentives. ReliaStar further seeks information regarding how ESI and Accredo were compensated, either directly or indirectly, under the various agreements by and between Henkel and ESI, ESI and Accredo and/or ESI and the manufacturers of the Subject Drugs.

(Doc. No. 93, Ex. G at 82; *see also* Doc. No. 89-1, Ex. 2). Additionally, ReliaStar moves to compel responses to Request Nos. 4-8 in the subpoena directed to Accredo, in which ReliaStar seeks

> documents and communications relating to any direct or indirect compensation received by or paid to Accredo, including without limitation, rebates, discounts and other financial incentive. ReliaStar further seeks information regarding how Accredo were compensated, either directly or indirectly, under the various agreements by and between ESI and Accredo and/or Accredo and the manufacturers of the Subject Drugs. ReliaStar seeks also documents and communications relating to the reimbursement rates, retail spread, pricing methodology, profits and revenues attributable to the Subject Drugs.

(Doc. No. 93, Ex. H at 89; *see also* Doc. No. 89-1, Ex. 2). Thus, in these requests, ReliaStar is asking for responses relating to the agreements between ESI and Accredo and/or ESI and the manufacturers of the Subject Drugs, as well as the information regarding how Accredo was compensated under the agreements with the manufacturers of the Subject Drugs. (See Doc. No. 80, Ex. 6).

As discussed above, the Court, in its March Ruling, ordered discovery in this case in line with the Second Circuit's holding in *Hobson*. Henkel asserts that ESI and its subsidiary Accredo were substantively evaluating and approving the participants' prescription drug benefits, and in connection with the prescription drug orders filled under the Henkel Plan, reaped a financial windfall. (*See* Doc. No. 89-1 at 8). This claim creates "the kind of conflict of interest that courts must take into account and weigh as a factor in determining whether there was an abuse of discretion[.]" *McCauley*, 551 F.3d at 133 (citing *Glenn*, 554 U.S. at 111). Although the existence of such a conflict would not change the standard of review to *de novo*," *McCauley*, 551 F.3d at

133 (citing *Glenn*, 554 U.S. at 111), the reviewing judge must "take account of the conflict when determining whether the trustee, substantively or procedurally, has abused his discretion." *Glenn*, 554 U.S. at 115. Thus, even if Henkel had not alleged self-dealing by ESI, the Supreme Court's holding in *Glenn* dictates that, in the face of a claim of conflict of interest, discovery into the existence and extent of the conflict is necessary. *Glenn*, 554 U.S. at 110-11 (holding that the "reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion . . . [;] the significance of the factor will depend on the circumstances of the case").

At this stage of the case, the Court cannot accept as fact ESI's position that it had neither a fiduciary duty nor the ability, under the contract with Henkel, to exercise any discretion. As the Court held in the March Ruling, discovery is appropriate to determine whether "the administrators' decisions in the case were supported by substantial evidence" and/or if there was an abuse of authority. This requires an examination of whether there were any conflicts of interest that could have impacted ESI's and Accredo's decisions. *See Joyner v. Continental Cas. Co.*, 837 F. Supp. 2d 233, 240 (S.D.N.Y. 2011) (holding that discovery concerning an "alleged financial conflict" is relevant to a potential abuse of discretion). Thus, given the allegation of a financial conflict of interest, discovery beyond the administrative record is reasonable, *Joyner*, 837 F. Supp. 2d at 242, as "[i]t logically follows that some amount of discovery is necessary, to enable the Court to determine the extent and nature of the conflict and the appropriate weight to give this conflict in the ultimate merits analysis, *i.e.*, to enable the Court to determine whether [the] conflict of interest affected the reasonableness of the administrator's benefits decision." *Murphy v. First Unum Life Ins. Co.*, No. 15-CV-820, 2016 WL 526243, at *5 (E.D.N.Y. Feb. 9, 2016) (quoting *Tretola v. First Unum Li[f]e Ins. Co.*, No. 13-cv-231, 2013 WL 2896804, ay *3 (S.D.N.Y. Jun. 13, 2013))

11

(additional citation omitted). This discovery includes information relating to direct and indirect payments, rebates and other considerations that ESI and Accredo received as a result of the pharmacy benefits approved by ESI.

2.        CONFIDENTIALITY CONCERNS

A Standing Protective Order entered in this case on June 8, 2018 (Doc. No. 6), and on October 18, 2018, the Court entered the parties' Joint Stipulation and Protective Order which protects "certain information that the parties believe to be of a non-public, confidential, and sensitive nature, including, but not limited to, proprietary business information, or information implicating an individual's legitimate expectation of privacy, including personal health information" or information protected under HIPAA. (Doc. Nos. 42-43). The terms of the Stipulation and Protective Order protect confidential information, including trade secrets and proprietary business information, as well as non-public information that a designating party reasonably and in good faith believes is so highly sensitive or proprietary in nature that its disclosure to a third party could result in significant competitive or commercial disadvantage" to the designating party. (Doc. No. 42 at 4-5). Moreover, under the terms of the Joint Stipulation and Protective Order, material that is designated as confidential may only be disclosed to parties and counsel involved in this action, and upon agreement to be bound by the terms of the Order, the designated material may be disclosed to witnesses, prospective witnesses and outside experts. (Doc. No. 42 at 6).

Neither Henkel nor ReliaStar are ESI's market competitors, and thus, ESI's concern that the Drug Manufacturers can gain access to confidential agreements which could lead to antitrust risks, is not well-founded. Moreover, the Drug Manufacturers are non-parties, and thus, would not receive designated confidential material. Additionally, the Court disagrees with ESI's

contention that "a protective order is not absolute and foolproof." (Doc. No. 80-1 at 13 n.9). Accordingly, the Court concludes that the Joint Stipulation and Protective Order adequately protects the confidentiality of the requested documents.

Accordingly, ReliaStar's Motion to Compel (Doc. No. 89) is GRANTED. ESI and Accredo shall serve its responses *on or before December 20, 2019.*

### 3. DISCOVERY FROM NON-PARTIES

Having concluded that the information related to financial incentives, rebates, and financial arrangements is discoverable and that the confidentiality of this information is adequately protected under the terms of the Joint Stipulation and Protective Order, the Court must address the remaining question, which is whether the information sought from the non-parties is duplicative of the information sought from ESI.

The burden of persuasion in a motion to quash a subpoena is borne by the movant. FED. R. CIV. P. 45(d)(3)(A)(iii)-(iv). "Whether a subpoena imposes an 'undue burden' depends upon 'such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed.'" *Travelers Indem. Co. v. Metropolitan Life Ins. Co.*, 228 F.R.D. 111, 113 (D. Conn. 2005) (quoting *United States v. Int'l Bus. Mach. Corp.*, 83 F.R.D. 97, 104 (S.D.N.Y. 1979)).

ESI argues that the subpoenas to the Drug Manufacturers are overly broad as they "extend over [ESI's] entire book of business and are not limited" to the claims at issue in this case, and they pose an undue burden in that they "ask that the manufacturers produce their rebate contracts with Express Scripts and Accredo, as well as documents showing how much the manufacturers paid Express Scripts and Accredo for rebates for the Subject Drugs, and documents showing

13

Accredo's acquisition costs." (Doc. No. 80-1 at 9). ReliaStar requested these documents from ESI and Accredo as well. Non-party Takeda/Shire moves to quash the subpoenas directed to them on the same grounds asserted by ESI, and because the information sought is "squarely in the possession, custody, and/or control" of ESI. (Doc. No. 107 at 1-2).

ReliaStar argues that, even if they receive documents responsive to their requests to ESI and Accredo, they should still receive these duplicate documents from the non-parties because they are entitled to a "fulsome production of relevant documents . . . corroborated by the business records of third parties who are presumptively independent of ESI and/or Accredo." (Doc. No. 98 at 11-12). In support of this contention, ReliaStar relies on *Hawkins v. Medapproach Holdings, Inc.*, 13 CV 1534 (ALC)(DF), 2014 WL 11350177 (S.D.N.Y. June 27, 2014). In that case, the non-party movants had "not persuaded the [c]ourt that the responsive documents . . . [were] unduly duplicative of those obtained or obtainable directly from [parties to the litigation] . . . , or that Plaintiff otherwise has access to the documents that are the subject of the Subpoenas." *Id.* at 4. In this case, the requests are duplicative, and, as discussed above, ESI and Accredo have been ordered to produce the responsive documents by December 20, 2019. Bearing in mind the "special weight" that Courts give "to the burden on non-parties of producing documents to parties involved in litigation[,]" *Travelers Indem.*, 228 F.R.D. at 113 (citation omitted), the Court declines to order duplicative discovery.

Accordingly, ESI's Motion to Quash (Doc. No. 80) is GRANTED, and Non-Party Takeda/Shire's Motion to Quash (Doc. No. 107) is GRANTED.

### C. MOTIONS RELATED TO DEPOSITION TESTIMONY OF DRS. KANAREK AND NEUSTROM

The second category of discovery motions pending before the Court relate to the depositions of two treating physicians who prescribed the Subject Drugs at issue in this case. On

14

October 16, 2019, movants Dr. Henry Kanarek and the Duffins filed a Motion to Quash Deposition Subpoena and Stay Deposition of Dr. Kanarek (Doc. No. 95; *see also* Doc. Nos. 111-12, 123), and on October 30, 2019, movants Dr. Mark Neustrom and the Duffins filed a Motion to Quash Deposition Subpoena and Stay Deposition of Dr. Neustrom (Doc. No. 105; *see also* Doc. Nos. 118, 124). The two motions are identical in substance, both raising the same three grounds on which the subpoenas should be quashed: (1) the subpoenas are unduly burdensome; (2) it is "unlikely that any information" provided by Drs. Kanarek and Neustrom "would fall within the limits set forth" in the March Ruling; and, (3) the subpoenas violate the physician-patient privilege. (Doc. No. 95 at 3-4; Doc. No. 105 at 3-4).

As discussed above, the scope of discovery permitted in this case is dictated by the Court's March Ruling. In that decision, the Court defined the applicable standard in this case as "'whether a reasonable person, given the evidence presented in the administrative record, could have reached the same decision, not whether the reasonable person would have reached a like decision.'" (Doc. No. 47 at 3 (quoting *Computer Aided Design Sys.*, 235 F. Supp. 2d at 1061)). In reaching that conclusion, the Court observed that ReliaStar has neither "the right to 'veto' the plan administrators' determinations merely because ReliaStar disagrees with such determination[,]" nor the obligation to pay for coverage "without question." (Doc. No. 47 at 2). Under the stop loss policy provided by ReliaStar, Henkel agreed to pay monthly premiums to ReliaStar, and ReliaStar in turn agreed to cover the medical and prescription drug claims under the Plan that exceeded an agreed deductible. (Doc. No. 56 ¶ 66). ReliaStar would, therefore, reimburse expenses which ReliaStar's "audit . . . determined to be properly payable[]" under the Henkel Plan. (Doc. No. 56-6 at 7). In this case, ReliaStar's audit found a lack of medical necessity for the prescriptions ordered by Drs. Kanarek and Neustrom, based on insufficient testing to confirm the diagnoses in

15

question, and the audit, which relied on an interpretation of Aetna's clinical policy for the condition at issue, found that the amount of and manner in which the drugs were prescribed rendered their use experimental and investigational. (Doc. No. 56 ¶¶ 107, 111-14, 117, 175).

In order for ReliaStar to be liable for not covering the excess expenses, Henkel must prove that ReliaStar denied coverage for expenses that were "properly payable" under the Plan. ReliaStar argues that it does not determine what is properly payable; Henkel does. Henkel alleges that the "Plan's fiduciary claims administrators . . . made their coverage determinations based on the terms of the Plan, with the full panoply of the Participants' medical records, and with years of ongoing engagement and communications with the Participants' healthcare providers[.]" (Doc. No. 56 ¶ 119). ReliaStar is seeking discovery into precisely that information.

ReliaStar may seek discovery into whether the prescriptions at issue were medically necessary, experimental, or investigational, because if they were the latter, they were not properly payable under the Henkel Plan, and thus, ReliaStar would not have a reimbursement obligation. As a result, discovery into the evidence presented in the administrative record, as well as evidence supporting the determinations of the doctors who issued the prescriptions at issue, is necessary.

As the court in *Computer Aided Design Sys.* explained, "[t]o ascertain the reasonableness of the plan administrator's factual review and application of the plan language in making a coverage decision, the Court looks to whether the decision was supported by substantial evidence[,]" which, includes considering the information that the plan administrator had at the time the claim was processed, as well as contradictory opinions submitted by the excess loss insurer. *See Computer Aided Design Sys.*, 235 F. Supp. 2d at 1061 (citation omitted). Both doctors communicated with ESI and Accredo regarding the use of the prescription drugs that are the subject of the coverage decisions at issue in this case. The Court agrees with ReliaStar that the

underlying communications from the physicians go to whether there is substantial evidence for ESI's coverage decisions, or, conversely, whether ESI abused its authority in approving coverage for these prescriptions. (*See* Doc. No. 113 at 3).

"[T]he standard for permitting discovery to supplement the administrative record in an ERISA case is far less stringent than the standard for actually considering the outside evidence." *Joyner*, 837 F. Supp. 2d at 240 (multiple citations omitted). The definition of "less stringent[,]" however, is "somewhat unclear." *Id.* A plaintiff "need not make a full good cause showing, but must show a reasonable chance that the requested discovery will satisfy the good cause requirement." *Baird v. Prudential Ins. Co. of Am.*, No. 09 Civ. 7898, 2010 WL 3743839, at *8 (S.D.N.Y. Sept. 24, 2010).

In this case, if the standard of review is whether the administrator's decision was arbitrary and capricious, the Court is limited to reviewing the administrative records, and thus, communications from these doctors may not be admissible. But at the discovery stage, ReliaStar may obtain discovery outside the administrative record, with its admissibility to be determined at a later stage. *Joyner*, 837 F. Supp. at 240. If ESI establishes that it exercised no discretion in approving the prescription drug dispenses at issue, then the standard of review in determining whether the prescription drug claims were covered under the Henkel Plan would be *de novo*, which leaves the door open for a more thorough review of the doctors' diagnoses and treatment. The information Drs. Kanarek and Neustrom have is relevant to the parties' claims and defenses. Moreover, to the extent that this information is privileged, the privilege was waived when this information was submitted to Henkel, ESI and Accredo for coverage determinations. *See* 45 C.F.R. §§ 164.502(a)(1), 164.506 (protected health information may be disclosed for treatment, payment or health care operations). Accordingly, the Joint Motion to Quash the Deposition

Subpoena and Stay the Deposition of Dr. Henry J. Kanarek (Doc. No. 95) is DENIED, and the Joint Motion to Quash the Deposition Subpoena and Stay the Deposition of Dr. Mark Neustrom (Doc. No. 105) is DENIED.

### D. CONCLUSION

For the reasons stated above, ESI's Motion to Quash (Doc. No. 80) is GRANTED; ReliaStar's Motion to Compel (Doc. No. 89) is GRANTED; Non-Party Takeda/Shire's Motion to Quash (Doc. No. 107) is GRANTED; the Joint Motion to Quash the Deposition Subpoena and Stay the Deposition of Dr. Henry J. Kanarek (Doc. No. 95) is DENIED; and, the Joint Motion to Quash the Deposition Subpoena and Stay the Deposition of Dr. Mark Neustrom (Doc. No. 105) is DENIED.

This is not a Recommended Ruling. This Ruling is reviewable pursuant to the "clearly erroneous" statutory standard of review. *See* 28 U.S.C. § 636(b)(1)(A); FED. R. CIV. P. 72(a); and D. CONN. L. CIV. R. 72.2. As such, it is an order of the Court unless reversed or modified by the district judge upon timely made objection.

Dated at New Haven, Connecticut, this 6th day of December, 2019.

                                                                      /s/ Robert M. Spector, USMJ
                                                                      Robert M. Spector
                                                                      United States Magistrate Judge