## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HENKEL OF AMERICA, INC., | ) | |
| | ) | No.  3:18-CV-00965-JAM-RMS |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | **SECOND AMENDED COMPLAINT** |
| | ) | |
| RELIASTAR LIFE INS. CO., and | ) | |
| EXPRESS SCRIPTS, INC. | ) | |
| | ) | DEMAND FOR JURY TRIAL |
| DEFENDANTS. | ) | |
| | ) | April 8, 2020 |

Plaintiff Henkel of America, Inc. ("Henkel"), by and through its undersigned counsel, for its Second Amended Complaint against Defendants ReliaStar Life Insurance Company ("ReliaStar") and Express Scripts, Inc. ("ESI"), alleges as follows:

### INTRODUCTION

1.      For decades, Henkel has provided health benefits to Henkel employees and their dependents through a group employee benefit plan.

2.      Group employee health benefit plans are typically either "fully insured" or "self-funded."  In a fully insured plan, a sponsoring employer pays premiums to an insurance company that in turn provides medical and prescription drug benefits to covered employees and their dependents in accordance with the terms of the insurance policy.  Under this type of benefit plan, the insurance company bears the obligation (and risk) of paying claims for such benefits under the policy.  In a self-funded plan, an employer maintains its own health plan (not through an underlying insurance policy) and pays for the medical and prescription drug expenses that are covered under the terms of the plan for covered employees and their dependents from the employer's own funds, bearing the full risk of the cost of those claims.

3.     Because self-funding exposes employers to the entirety of the cost of benefits under their group health plans, most employers with self-funded plans mitigate the risk of high-cost medical and prescription drug claims by purchasing a product called "stop-loss" insurance.  Under a stop-loss policy, the stop-loss insurer takes on the risk of claims under the self-insured health plan that exceed an agreed threshold, giving the employer and its self-funded plan—and ultimately its covered employees and dependents—essential protection against unanticipated high-dollar claims.

4.     Stop-loss insurance is thus a critical component of a self-funded employee benefit plan.  As a backstop that provides certainty for an employer's potential exposure, stop-loss insurance enables companies across the country to offer comprehensive self-funded benefit plans.  Without the protection of stop-loss insurance, employers sponsoring self-funded plans would continually face the threat of unexpected catastrophic claims that could render their plans financially unsustainable and force the employers to curtail coverage for the entire employee base.

5.     Henkel's medical and prescription drug coverage is governed by a legal Plan document entitled the Henkel of America Group Benefit Plan (the "Plan").

6.     The Plan was most recently restated effective May 1, 2010, and certain provisions subsequently have been amended through a series of nine amendments.  The Plan, together with all amendments thereto, is attached hereto as Exhibit A.

7.     The medical and prescription drug coverage under the Plan is self-funded.  Henkel bears the cost of paying the medical and prescription drug claims under the Plan and relies on stop-loss insurance to manage the risk of high-dollar medical and prescription drug claims.

8.     For ten years, ReliaStar was Henkel's stop-loss insurer, collecting tens of millions of dollars in premiums from Henkel for the stop-loss coverage ReliaStar provided during that time.

That relationship ended in 2017, when Henkel was faced with the very liability that makes stop-loss insurance necessary, and ReliaStar refused to fulfill its end of the bargain.

9.      The vast majority of employers offering health benefits to employees through self-funded plans are not themselves health care providers or drug companies.  They are not experts in providing medical care, making prescription decisions or passing judgment on the efficacy of treatment.

10.     Henkel is a manufacturing and consumer goods company with no institutional expertise in benefit claim administration.  To ensure that self-funded plans are responsibly administered and that employees and dependents receive the benefits to which they are entitled, it is standard practice for employer sponsors like Henkel to engage professional third-party claims administrators to adjudicate medical and prescription drug claims submitted for coverage under the plan.

11.     For more than a decade, Henkel has contracted with Defendant ESI to serve as its designated third-party claims administrator for prescription drug benefits under the Plan and with Aetna Life Insurance Company ("Aetna") to serve as its designated third-party claims administrator for medical benefits under the Plan.

12.     Beginning in late 2015 and continuing through the end of 2017, two participants in Henkel's Plan ("the Participants") each received extremely costly medical and prescription drug treatments for a rare condition.

13.     All of the Participants' medical and prescription drug expenses at issue were approved for coverage under the Plan by the Plan's designated claims administrators.  These claims administrators had the express discretionary authority as fiduciaries under the Plan to construe and

interpret the Plan, process claims submitted by Plan participants, make factual findings about eligibility for benefits, and render final and binding coverage determinations.

14.     These designated claims administrators were also contractually bound by the terms of their respective agreements with Henkel.  As alleged in greater detail below, the contracts between Henkel and ESI provide an alternative basis for the relief Henkel seeks from ESI.

15.     Once approved by the third-party claims administrator, the medical and prescription drug claims at issue were paid by Henkel and properly submitted to ReliaStar for reimbursement under the stop-loss policy.

16.     In 2015, when only one Participant was receiving treatment and the claims were in the hundreds of thousands of dollars, ReliaStar reimbursed Henkel for the claims that exceeded the deductible under the stop-loss policy.  But in 2016 and 2017, when a second Participant began receiving treatment for the same condition and the combined cost of the Participants' claims ran into the millions, and then the tens of millions of dollars, ReliaStar searched for a way out.

17.     ReliaStar did nothing as the costs mounted in 2016, never contesting coverage for either Participant's claims under the stop-loss policy or otherwise and ultimately demanding a $25,000 increase in individual deductibles and over half a million dollars in increased premiums for the 2017 policy renewal.

18.     In 2017, as costs continued to mount and Henkel's claims for reimbursement from ReliaStar remained pending, ReliaStar hired an outside consultant, Optum Healthcare ("Optum"), to "assess" the Plan's underlying coverage determinations with respect to the two Participants' respective treatments.

19.     Optum ultimately came to the opposite conclusion of the Plan's fiduciary claims administrators, asserting that none of the expenses incurred for the Participants' treatments should have been covered by the Plan because, in its opinion, the treatments were "experimental and investigational."  As a result, ReliaStar denied its obligation to reimburse Henkel under the stop-loss policy for any of the expenses related to either Participant's approved treatments in 2016 or 2017.

20.     In denying reimbursement of the claims, ReliaStar acted in contravention of the terms of the stop-loss policy and the Plan by ignoring the sole discretionary authority that the Plan grants to Henkel and its designated claims administrators to construe and interpret the Plan, and attempting to overrule the Plan's final and binding coverage determinations.

21.     ReliaStar's refusal to honor its contractual obligations has cost Henkel more than $47 million in unreimbursed claims.  Henkel brings this action to obtain the stop-loss coverage it paid for, and to which it is entitled.

22.     Henkel filed a Rule 12(c) Motion for Judgment on the Pleadings on August 16, 2018.  This Court denied the motion on March 28, 2019, ruling in part that "ReliaStar does not have the right to 'veto' the plan administrators' determinations merely because ReliaStar disagrees with such determinations."  (Mem. of Dec. on Pl.'s Mot. for J., March 28, 2019, ECF No. 47).

23.     The March 28, 2019 ruling states that, for purposes of determining ReliaStar's coverage obligations under the stop-loss policy, "the question is not whether ReliaStar *would have* reached the same conclusion as the plan administrators[,]" but rather "whether a reasonable person, given the evidence presented on the administrative record, *could have* reached the same decision." *Id.* (quoting *Computer Aided Design Sys., Inc. v. Safeco Life Ins. Co.*, 235 F. Supp. 2d 1052, 1061 (S.D. Iowa 2002)) (emphasis added).

5

24.     Accordingly, under the March 28, 2019 ruling, ReliaStar is responsible for the full amount of the Participants' prescription drug claims submitted under the stop-loss policy in 2016 and 2017 unless ESI acted arbitrarily and capriciously and abused its discretion in approving the disputed prescription drug claims.  ESI did not; thus, ReliaStar is obligated to pay.

25.     In the alternative to its claims against ReliaStar, Henkel, as sponsor of the Plan and as a fiduciary of the Plan and in a representative capacity on behalf of the Plan, seeks reimbursement from ESI to restore to the Plan the nearly $49 million in prescription drug benefits ESI approved on behalf of the Participants in breach of its fiduciary duty under ERISA and its contractual obligations to Henkel under the governing agreements.

26.     ESI breached the fiduciary duties under ERISA that it owed to the Plan and its participants as the designated prescription drug claims administrator.  ESI ignored the criteria set forth in its Prior Authorization Policies; failed to perform standard drug utilization reviews when evaluating the prescription drug claims at issue; and failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims required of it in interpreting the terms of the Plan and determining that the prescription drug claims at issue were covered under the Plan.

27.     Separately, by failing to adhere to its Prior Authorization Policies in evaluating the Participants' prescription drug claims at issue and by failing to perform standard drug utilization reviews as required under the terms of its governing contracts with Henkel, ESI also breached the contractual duties it owed to Henkel under those agreements.  Accordingly, the contracts between ESI and Henkel provide a separate basis for Henkel to recover the losses ESI caused by breaching the relevant agreements.

## THE PARTIES

28.     Plaintiff, Henkel of America, Inc., is a Delaware corporation with its principal place of business at One Henkel Way, Rocky Hill, Connecticut 06067.

29.     Defendant, ReliaStar Life Insurance Company, is a Minnesota corporation with its principal place of business at 20 Washington Avenue South, Minneapolis, MN 55401.  ReliaStar Life Insurance Company is a wholly owned subsidiary of Voya Financial, Inc.

30.     Defendant, Express Scripts, Inc., is a Delaware corporation with its principal place of business at 1 Express Way, St. Louis, MO 63121.

## JURISDICTION AND VENUE

31.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 because Henkel's ERISA claim against ESI arises under federal law.

32.     This Court has supplemental jurisdiction over Henkel's state and common law claims against both ReliaStar and ESI under 28 U.S.C. § 1367 because those claims are so related to Henkel's ERISA claim as to form part of the same case or controversy.

33.     The Court has personal jurisdiction over ReliaStar.  ReliaStar has sufficient minimum contacts with Connecticut and has intentionally availed itself of the benefits and protections of the state of Connecticut.  ReliaStar specifically and intentionally contracted with Henkel, which has its principal place of business in Rocky Hill, Connecticut.  Further, ReliaStar delivered the policy to Henkel in Connecticut, accepted premiums paid from Connecticut, corresponded with Henkel about the policy in Connecticut, registered with the Connecticut Department of Insurance, and, on information and belief, is licensed and conducts substantial insurance business in Connecticut.  Additionally, ReliaStar consented to personal jurisdiction in Connecticut through a forum selection clause in its stop-loss policy with Henkel.

34.     The Court also has personal jurisdiction over ESI.  ESI has sufficient minimum contacts with Connecticut and has intentionally availed itself of the benefits and protections of the state of Connecticut.  ESI specifically and intentionally contracted with Henkel, which has its principal place of business in Rocky Hill, Connecticut.  Further, ESI accepted payments from Connecticut, corresponded with Henkel about its services in Connecticut, performed claims adjudication functions related to Henkel employees located in Connecticut, and, on information and belief, conducts substantial business in Connecticut.

35.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in Connecticut.  Henkel's principal place of business is in Connecticut.  The insurance policy at issue between Henkel and ReliaStar was delivered in Connecticut.  Similarly, the contracts at issue between Henkel and ESI were executed in Connecticut.  With respect to Henkel's claims against ReliaStar, venue is also proper in this district pursuant to the forum selection clause in the stop-loss policy between Henkel and ReliaStar.

## FACTUAL ALLEGATIONS

I.     **THE PLAN**

A.     **As The Plan Administrator, Henkel Has Sole Authority To Construe And Interpret The Plan And To Make Coverage Determinations.**

36.     The Plan designated the Remuneration and Benefits Committee of Henkel of America, Inc. as the Plan Administrator through the end of 2016.  (Ex. A; Plan at 4th Amend. § 2.28)  Effective January 1, 2017, the Plan was amended to designate Henkel's Benefits Administrative Committee as the Plan Administrator.  (*Id.* at 9th Amend. § 2.28)

37.     Under the Plan, "the Plan Administrator shall administer the Plan and shall be the

'named fiduciary' of the Plan for purposes of Section 402(a) of ERISA." (*Id.* at 4th Amend. §

12.1)

38.     The Plan grants clear and unambiguous discretionary authority to the Plan

Administrator to interpret the Plan and determine whether claims are eligible for coverage under

the Plan:

> The Plan Administrator **shall have the sole authority and responsibility** to control and manage the operation and administration of the Plan. The Plan Administrator shall enact such rules and regulations consistent with the Plan as it may consider desirable for the conduct of its business and for the administration of the Plan. The Plan Administrator **shall have all power, authority, and discretion** necessary:
>
> (a) **to construe and interpret the Plan, decide all questions of eligibility for benefits** including factual determinations **and determine the amount, manner and time of payment of any benefits under the Plan**; the Plan Administrator's **determinations shall be final and binding** and shall not be overturned by a court of law, unless the claimant can demonstrate that the Plan Administrator's determination was arbitrary or capricious.

(*Id.* at § 12.2 (emphasis added))

39.     The Plan expressly authorizes Henkel to designate outside professionals to carry

out specific fiduciary responsibilities under the Plan:

> The Company (pursuant to its Board of Directors) or the Plan Administrator may … allocate to any person or entity all or any of the powers or duties granted to the Plan Administrator under this Article XII. To the extent of any such allocation, such person or entity shall become the named fiduciary responsible for administration of the Plan (if such person or entity is a fiduciary by reason of the allocation), and references to the Plan Administrator shall apply instead to such person or entity.

(*Id.* at 4th Amend. § 12.1)

40.     The designation of fiduciary administrators in this manner is specifically authorized

under ERISA, 29 U.S.C. § 1105(c).

9

41.   The Plan also expressly authorizes Henkel to appoint third parties to carry out administrative duties and to rely in good faith on the opinions of such third-party experts:

> The Plan Administrator shall have all power, authority, and discretion necessary . . . (e) to appoint or employ individuals to carry out administrative duties under the Plan and any other agents it deems advisable, and to rely in good faith upon the opinion of any professional or specialist so employed.

(*Id.* at § 12.2)

42.   The Plan further defines the role of such designated third-party claims administrators in its explanation of the Claims Procedure:

> Claims for non-insured benefits under the Plan shall be made to the Plan Administrator, or if so designated by the Plan Administrator, to a third party appointed by the Plan Administrator which ***shall make all determinations as to the right of any claimant to a benefit under the Plan***.

(*Id.* at 3rd Amend. § 13.1 (emphasis added))

43.   As detailed below, pursuant to its express authority under the Plan to delegate specific administrative powers and duties, Henkel designated Aetna as the Plan's fiduciary claims administrator for medical benefits and ESI as the Plan's fiduciary claims administrator for prescription drug benefits.

**B.   Henkel Delegates Discretionary Authority To Aetna As The Fiduciary Claims Administrator For Medical Benefits Under The Plan.**

44.   The relationship between Aetna and Henkel with respect to the administration of medical benefits is set forth in a 2004 administrative services agreement ("ASA") between Aetna and Henkel's predecessor, the Dial Corporation ("Dial"), and in subsequent amendments thereto. The ASA, together with all relevant amendments thereto, is attached hereto as Exhibit B.

45.   In 2007, Dial agreed to transfer to Henkel, and Henkel agreed to accept from Dial, all of Dial's rights and obligations under the ASA.  Aetna consented to this transfer of rights and

10

obligations and agreed thereafter to be bound to Henkel under the terms of the ASA.  (Novation Agmt. (1/1/2007), attached hereto as Exhibit C)

46.     Under the ASA, Aetna is responsible for "process[ing] and pay[ing] the claims for Plan benefits incurred after the Effective Date using Aetna's normal claim determination, payment, and audit procedures, and applicable cost control standards in a manner consistent with the terms of the Plan and the [ASA]."  (Ex. B; ASA at 16, Description of Servs. Add. §I.A.1)

47.     In 2010, Aetna and Henkel amended the ASA clarifying Aetna's designation as a fiduciary claims administrator under the Plan.  The 2010 amendment sets forth Aetna's authority and discretion to carry out its fiduciary responsibilities as claims administrator:

> In exercising such fiduciary responsibility, Aetna … shall have ***discretionary authority to determine whether and to what extent participants and their beneficiaries are entitled to benefits, and to construe disputed or doubtful Plan terms*** and shall discharge their duties consistent with ERISA, the Plan and the Contract.   The parties acknowledge that, unless Aetna acts arbitrarily and capriciously, its decisions shall be afforded deference by a court on review.

(*Id.* at ASA Letter Amend. (3/9/10) (emphasis added))

48.     With respect to this role, Aetna is a fiduciary to the Plan under the Employee Retirement Income Security Act of 1974 ("ERISA"), pursuant to 29 U.S.C. §§ 1002(21)(A) and 1102(a)(2).  (*Id.*)

49.     Aetna's discretionary authority as a Plan fiduciary under the 2010 ASA amendment is consistent with the discretionary authority granted to Henkel and its designated fiduciaries under the Plan.  (*Compare id. with* Ex. A, Plan at § 12.2)

### C.     Henkel Delegates Discretionary Authority To ESI As The Fiduciary Claims Administrator For Prescription Drug Benefits Under The Plan.

50.     The contractual relationship between Henkel and ESI with respect to the administration of prescription drug benefits under the Plan is set forth in the parties' Integrated

Prescription Drug Program Agreement ("IPDPA"), effective January 1, 2014 (Exhibit D-1); in amendments and addenda (Exhibit D-2); and in the Pharmacy Benefit Management Agreement ("PBMA"), effective January 1, 2017 (Exhibit D-3).

51.     Under the IPDPA, ████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████

52.     ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

53.     The PBMA replaced the IPDPA effective January 1, 2017.  Like the IPDPA, the PBMA also ████████████████████████████████████████

54.     ████████████████████████████████████████████████████████████
████████████████████████████████████

55.     With respect to its role in making claims determinations for prescription drug benefits under the Plan, ESI is a fiduciary to the Plan under ERISA, pursuant to 29 U.S.C. §§ 1002(21)(A) and 1102(a)(2).

56.     While the language of both contracts is a sufficient basis to establish ESI's fiduciary status under ERISA, it is not the sole basis.  Throughout the time period relevant to these claims,

ESI performed fiduciary functions by bringing its special expertise—the very expertise for which Henkel hired it—to bear in exercising discretionary authority and control over claims determinations for prescription drugs under the Plan.

57.     As a Plan fiduciary, ESI and/or Accredo, ESI's wholly owned subsidiary and delegate with respect to the administration and provision of specialty drugs, employed their specialized expertise and made discretionary Plan coverage decisions with respect to, among other items, prescription drug approval, dose justification, and the clinical course of treatment for the Participants' conditions.

58.     Under the IPDPA and PBMA, ███████████████████████████ ████████████████████████████████████████

59.     Among other things, ESI was required under its agreements with Henkel to ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ████████████████████

60.     In carrying out its prior authorization services, ESI utilized its own proprietary and confidential coverage criteria, which ESI drafted and copyrighted.  ESI calls its proprietary coverage criteria "Prior Authorization Policies".  An example of one of the Prior Authorization Policies for one of the prescription drugs at issue is attached hereto as Exhibit E.

61.     ESI's Prior Authorization Policies, which are implemented and periodically updated following approval by ESI's internal Therapeutic Assessment Committee, provide highly

detailed summaries of each drug's medical and pharmacological literature, technical summaries of the treatment guidelines published by consensus organizations for each drug, and a specific set of criteria for ESI's determination of individual participant claims.  (*E.g.*, *id.*)

62.    Additionally, for each prescription submitted on-line for processing, ESI was required to ████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████

63.    The contracts also provided that ████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

█████████████████████████████████████

64.    In carrying out its claims administration function, ESI and/or Accredo collected the Participants' medical documentation and communicated directly with the Participants and their medical providers concerning their course of treatment, including the combination of drugs and dosages of each drug with which each Participant was treated.

65.    Through its development of its proprietary and highly technical Prior Authorization Policies; its interpretation and application of those Prior Authorization Policies in the context of the Participants' medical and diagnostic detail and their medical providers' prescribed courses of drug treatments; and its ongoing review of each Participant's drug utilization, including communicating with the Participants and their medical providers concerning their course of treatment, drug interactions and dosages, and monitoring for inappropriate usage, ESI exercised

discretionary control over interpreting the Plan's terms to determine if the prescription drugs at issue were covered.

66.    Henkel relied on ESI's special expertise in performing these functions.  While Henkel monitors the activity of its third-party administrators, it has no contact with its Plan participants or their doctors in the ordinary course, nor does it have any involvement in the determination of individual prescription drug claims by ESI under the Plan or in ESI's ongoing review of participants' prescription drug treatments, including for the two Participants.

67.    In consideration for services related to administering and determining claims for prescription drug benefits, ███████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███

## II.    THE HENKEL-RELIASTAR STOP-LOSS POLICY

68.    Henkel first purchased stop-loss insurance from ReliaStar Life Insurance Company, effective January 1, 2007.  The policy relevant to this dispute, Group Policy Number 64795-1EXRSK ("the Policy"), issued on January 1, 2013, was amended effective January 1, 2016 and subsequently renewed for calendar year 2017.  The Policy, delivered in the state of Connecticut, is attached hereto as Exhibit F.

### A.    The Plan Is Incorporated Into The Policy.

69.     Under the Policy, ReliaStar is bound by and subject to the Plan provisions regarding the Plan Administrator's sole discretionary authority to interpret the Plan and render all coverage determinations under it.

70.     The Plan is attached to the Excess Risk Application, which is expressly incorporated into the Policy.  The Policy includes an "Entire Contract" provision, which provides:

> **ENTIRE CONTRACT:**   The entire contract between [Henkel] and [ReliaStar] consists of:
>
> A.     The Policy;
> B.     ***Your Excess Risk Application (a copy of which is attached to this Policy when issued)***;
> C.     The Excess Risk Schedule;
> D.     The signed Disclosure Agreement (a copy of which is attached to this Policy when issued); and
> E.     Any Endorsements included with and made part of this Policy.

(Ex. F; Policy at 11 (emphasis added))

71.     The Policy further provides that "[a] copy of Your Excess Risk Application and the Disclosure Agreement are ***attached to and form a part of this Policy***."  (*Id.* at 1 (emphasis added))

72.     In turn, the Policy specifies that the Excess Risk Application is comprised of the completed application form ***and*** the Plan, providing in the very definition of the term "Employee Benefit Plan" that "***the written Plan document*** on the Effective Date of this Policy ***is attached to the Excess Risk Application***."  (*Id.* at 3 (emphasis added))

73.     Pursuant to this chain of incorporation, the Plan is incorporated into and forms part of the Policy.

**B.     ReliaStar Is Obligated To Reimburse Expenses Paid By Henkel Under the Plan, Subject To Limited And Clearly Defined Exclusions In The Plan Mirroring Coordination Endorsement.**

74.     Under the Policy, Henkel agreed to pay monthly premiums to ReliaStar, and ReliaStar in turn agreed to cover the medical and prescription drug claims paid under the Plan that exceeded an agreed deductible.

75.     In 2015, the Policy deductible was $375,000 per individual while the Policy's annual premium was approximately $2,237,000.

76.     In 2016, the deductible remained at $375,000 per individual, but ReliaStar increased the Policy's annual premium to approximately $2,437,000.

77.     In 2017, ReliaStar increased the Policy's deductible to $400,000 per individual and increased the Policy's annual premium by more than $500,000 to $2,967,000, an increase of almost 22%.

78.     The Policy requires ReliaStar to reimburse Henkel for all Eligible Individual Excess Risk Expenses ("EIEREs") in excess of the individual deductible "for claims Paid that are:  (A) Incurred while the Employee Benefit Plan is in effect; (B) Paid according to the terms of the Employee Benefit Plan; and (C) Incurred and Paid during the Coverage Period shown on the Excess Risk Schedule."  (Ex. F; Policy at 5)

79.     Both "Paid" and "Incurred" are defined in the Policy:

**INCURRED** means the date on which services relating to an Eligible Excess Risk Expense were provided to a Covered Person or a Covered Dependent under the Employee Benefit Plan.

* * *

**PAID** means the latest of the following dates:

    A.  The covered expense is approved by You according to the terms of the Employee Benefit Plan; and
    B.  The draft or check is mailed, or the date the wire or other legal electronic transfer of funds has been issued by the Plan Sponsor to the Covered Person or his or her assignee;
    C.  Sufficient funds are on deposit on the date the check, draft, or

electronic transfer is issued to permit the check, draft or electronic
transfer to be honored.

(*Id.* at 4)

80.    Eligible Excess Risk Expenses are defined in the Policy as "either Eligible

Aggregate Excess Risk Expenses or Eligible Individual Excess Risk Expenses." (*Id.* at 3) EIEREs,

in turn, are defined as follows:

> Eligible Individual Excess Risk Expenses are those claims Incurred and Paid within
> the Coverage Period shown on the Excess Risk Schedule. All such expenses must
> be eligible expenses under the terms of the Employee Benefit Plan and covered
> under the terms of this Policy. The Coverage Period and rates for Excess Risk
> Insurance are shown on the Excess Risk Schedule. A separate Excess Risk
> Schedule applies to each Coverage Period. Eligible Individual Excess Risk
> Expenses are the benefits which Our audit has determined to be properly payable
> by You. Such benefits must be Paid during the Coverage Period to or on behalf of
> a Covered Person or Covered Dependent according to the terms of the Employee
> Benefit Plan. However, such expenses are subject to both the Exclusions Section
> of this Policy and the Excess Risk Schedule. Our Claim Audit procedures are
> contained in the Miscellaneous Provisions of this Policy. Expenses Incurred under
> a Prescription Drug Plan will be included as Eligible Individual Excess Risk
> Expenses only if Prescription Drugs are shown on the Excess Risk Schedule.

(*Id.* at 5)

81.    The scope of the "audit" referenced in the definition of EIEREs is also set forth in

the Policy:

> We may periodically examine any of Your or the Claim Administrator's records
> relating to the benefits under this Policy and any claims filed under the Employee
> Benefit Plan. We have the right to audit all claims with respect to Eligible Excess
> Risk Expenses Paid under the Employee Benefit Plan, in the event a claim for
> benefits is made under this Policy.

(*Id.* at 14)

82.    The Policy, however, also includes a key endorsement, termed the Plan Mirroring

Coordination Endorsement ("PMCE"). (*Id.* at PMCE) This endorsement is expressly incorporated

into the Policy. (*Id.* at 11)

83.     According to the PMCE, ReliaStar is obligated to reimburse Henkel for payments of Eligible Excess Risk Expenses that are "A. Paid according to the terms of Your Employee Benefit Plan; and B. Incurred and Paid during the Coverage Period shown on Your current Excess Risk Schedule." (*Id.* at PMCE)

84.     The PMCE further provides that "[t]he expenses Paid by You ***shall be considered*** Eligible Excess Risk Expenses, but will be subject to exclusions A, C, D, E and G of the Exclusions and Limitations section of the Excess Risk Policy." (*Id.* (emphasis added))

85.     The PMCE clarifies that "[i]n the event of a conflict between the terms, conditions and limitations of this Endorsement and the Excess Risk Policy, this Endorsement will control." (*Id.*)

86.     The PMCE thus limits any provision in the Policy that might purport to give ReliaStar a right to deny that expenses Paid by Henkel are Eligible Excess Risk Expenses based on an exclusion not specifically enumerated in the PMCE.

87.     As discussed in detail in Section V.A below, none of the exclusions enumerated in the PMCE are applicable to the claims at issue here.

### C.     ReliaStar Intentionally Omits Any Exclusion For "Experimental Or Investigational" Expenses From The Policy.

88.     ReliaStar purposely omitted from the Policy any language that might purport to reserve for itself a right to deny stop-loss coverage on the basis of its own separate and independent determination of whether the underlying claims are "experimental or investigational."

89.     ReliaStar has a standard stop-loss policy, which it issues to prospective customers ***outside*** Connecticut.  ReliaStar's standard policy is attached hereto as Exhibit G.

90.    The standard version of ReliaStar's stop-loss policy defines the term "Experimental or Investigational" and excludes such expenses from coverage in its Exclusions and Limitations section.  (Ex. G; Standard Policy at 4, 9)

91.    As further detailed in Section V.B below, when ReliaStar issued the Policy to Henkel in Connecticut, it specifically omitted the definition and exclusion of "Experimental or Investigational" expenses in order to comply with Connecticut law.

92.    In other words, in contrast to its standard policy, ReliaStar's Policy with Henkel contains no exclusion for "Experimental or Investigational" expenses, no definition of that term, and indeed no reference to it at all.  (Ex. F; Policy at 3-4, 6)

93.    Similarly, while the standard policy defines "Medically Necessary" and requires that expenses must be medically necessary before they will qualify as Eligible Excess Risk Expenses, ReliaStar's Policy with Henkel imposes no such limitation.  (*Compare* Ex. G; Standard Policy at 4, 6, *with* Ex. F; Policy at 4, 5)

94.    As noted above, the Policy's PMCE states that expenses Paid by Henkel "shall be considered Eligible Excess Risk Expenses, but will be subject to exclusions A, C, D, E and G of the Exclusions and Limitations Section of the Excess Risk Policy."  (Ex. F, Policy at PMCE)

95.    The exclusions listed in the PMCE correspond to the Exclusions and Limitations section of the **standard** policy.  Pursuant to Connecticut law, ReliaStar omitted from Henkel's Connecticut-based Policy several of its standard policy's Exclusions and Limitations, including "(B) Benefits Paid under the Employee Benefit Plan which are in excess of Usual and Customary charges," and "(F) Expenses which are Experimental and Investigational."  (Ex. G; Standard Policy at 9; Ex. F; Policy at 6)  Thus, the exclusions referenced in the PMCE (A, C, D, E and G) align with all of Henkel's remaining exclusions (A, B, C, D, and E).

96.     Indeed, even if the Policy's Exclusions and Limitations had included—consistent with ReliaStar's standard policy—"(F) Expenses which are Experimental and Investigational," the PMCE, which references *only* exclusions A, C, D, E and G and which governs in the event of a conflict, would not have recognized it as a valid basis for denying coverage under the Policy.

## III.     THE BENEFITS AT ISSUE

97.     In 2015, following diagnosis by the Participant's physicians, one of the Participants ("Participant One") began to receive treatment for a rare condition, which included specialty prescription drugs.

98.     In 2016, physicians diagnosed the second Participant ("Participant Two") with the same condition.  Following the diagnosis, Participant Two also began treatment, which likewise included specialty prescription drugs.

99.     Both Participants consulted with and received treatment for their conditions from multiple physicians and health care specialists practicing in several different specialties.

100.    Each of the prescription drugs prescribed by the Participants' physicians was approved by the FDA for treatment of ██████████████████████

101.    At all times relevant to this dispute, coverage was available under the Plan for each of the prescription drugs at issue, with individual claim determinations under the Plan's prescription drug benefit subject to the coverage criteria in ESI's proprietary Prior Authorization Policies.

102.    Further, the Participants' treating physicians prescribed each of the drugs at issue following their respective diagnoses.

103.    Aetna and ESI, subject to their fiduciary obligations to the Plan under ERISA as the Plan's claims administrators and subject to their contractual obligations to Henkel pursuant to

their respective contracts, evaluated the medical and prescription drug benefit claims of each of the Participants and rendered coverage determinations according to their interpretation of the terms of the Plan throughout 2015, 2016, and 2017.

104.   Aetna, exercising its discretion as claims administrator for medical benefits under the Plan, determined that the medical treatment of the Participants' condition was covered according to its interpretation of the terms of the Plan and approved the Participants' claims for such benefits.[1]

105.   Likewise, ESI, exercising its discretion as claims administrator for prescription drug benefits under the Plan, determined that the prescription drug treatments for the Participants' condition were covered according to its interpretation the terms of the Plan and approved the Participants' claims for such benefits.

106.   Once approved by the applicable fiduciary claims administrator pursuant to the terms of the Plan, Henkel paid each medical and prescription drug claim.

107.   Once Henkel paid the costs of each approved claim, stop-loss expense reimbursement documentation was properly and timely submitted to ReliaStar pursuant to the terms of the Policy.

108.   ReliaStar has never disputed that the form or timing of the reimbursement documentation submitted with respect to these claims complied with the terms of the Policy.

109.   From January to September of 2015, Henkel paid $700,831.30 in claims under the Plan related to the treatment of Participant One's condition.  Each claim was approved by the

---

[1]   Aetna has evaluated coverage for medical services for both Participants, and has denied coverage when it deemed appropriate.  Henkel does not seek reimbursement from ReliaStar for any underlying claims for which the Plan's fiduciary claims administrators denied coverage.  Henkel only seeks reimbursement for the claims that Aetna and ESI evaluated and approved according to the terms of the Plan.

designated claims administrators according to the terms of the Plan and all expenses were paid by Henkel pursuant to the Plan.

110.   On November 6, 2015, Henkel submitted claims for reimbursement to ReliaStar for $325,831.30, consisting of expenses related to the treatment of Participant One in 2015, less the then-applicable $375,000 individual deductible under the Policy.

111.   On April 25, 2016, ReliaStar reimbursed Henkel the full requested amount of $325,831.30 related to those treatment expenses.

112.   In 2016, Participant One's treatment continued, and Participant Two also began to receive treatment.  For calendar year 2016, ESI approved a total of $10,743,781.75 in prescription drug claims under the Plan related to the treatment of the two Participants' conditions.

113.   Reimbursement claims totaling $9,993,781.75 were then submitted to ReliaStar, reflecting the 2016 combined treatment expense total for both Participants less the applicable $375,000 individual deductibles for each Participant.

114.   In November 2016, ReliaStar proposed a 2017 Policy renewal that included increasing the individual deductible from $375,000 to $400,000 and increasing the premium by more than $500,000 from $2.4 million to $2.96 million, an increase of nearly 22%.

115.   Henkel's benefits consultant and broker, Mercer Health & Benefits LLC ("Mercer"), explained the terms of ReliaStar's renewal proposal and the basis for the increase in the policy premium and deductible to Henkel in a November 18, 2016 presentation.

116.   As described in the Mercer presentation, the basis for ReliaStar's increase in premiums and deductibles included the treatment of the Participants' conditions, which involved extremely high prescription drug costs for a lifelong condition, with claims expected to continue.

117.   Henkel subsequently agreed to ReliaStar's proposed renewal terms for the 2017 policy year, effective January 1, 2017.

118.   Both Participants continued to receive treatment for their conditions in 2017, which ESI continued to approve and Henkel continued to pay under the Plan.  In 2017, ESI approved a total of $38,206,162.55 in prescription drug claims under the Plan related to the prescription drug treatment of the two Participants' conditions.

119.   Reimbursement claims for such expenses approved and paid under the Plan were submitted to ReliaStar in accordance with the terms of the Policy.  The 2017 reimbursement claims relating to the Participants' treatments, which had been approved under the terms of the Plan by ESI (less the new $400,000 individual deductibles for each Participant) totaled $37,406,162.55.

## IV.   RELIASTAR'S DENIAL OF REIMBURSEMENT

### A.   ReliaStar Denies Reimbursement Based On Its Hired Consultant's Conclusion That The Underlying Expenses Were "Experimental And Investigational."

120.   All of the claims submitted to ReliaStar for reimbursement in 2016 and 2017 for the two Participants remained pending with ReliaStar until September of 2017.

121.   On September 13, 2017, ReliaStar informed Henkel by letter that it was declining to reimburse *any* of the 2016 and 2017 claims incurred by Henkel under the Plan for either of the two Participants.

122.   This coverage denial letter was ReliaStar's first written notification to Henkel that ReliaStar was declining reimbursement under the Policy for the medical and prescription drug benefits approved and paid under the Plan for the Participants.

123.   In its September 13, 2017 letter, ReliaStar stated that it had completed an audit of the claims submissions related to the two Participants and that it had also referred the claims to Optum for what ReliaStar characterized as "an independent clinical and plan coverage Claim

Payment Integrity Review."  ReliaStar included the Optum review as an attachment to its denial letter.  ReliaStar's September 13, 2017 letter to Henkel and Optum's "Claim Payment Integrity Review" are attached hereto as Exhibit H.

124.   In its review, Optum asserted that ReliaStar had retained it in June 2017, unbeknownst to Henkel, to assess coverage for the very same claims that Aetna and ESI, the Plan's fiduciary claims administrators, had already evaluated and approved under the Plan.

125.   Optum further stated that as part of its review, it requested the underlying claims materials to evaluate whether, in its estimation, the claims should have been covered under the Plan.

126.   There is no indication that Optum ever discussed the Participants' conditions, diagnoses, treatments, or prognoses with any of the Participants' healthcare providers.

127.   Rather, Optum relied on a subset of the Participants' medical records, and general clinical policies used by Aetna and ESI as guidelines for the treatment of the condition at issue, to reach its own determination that each of the Participants' prescribed treatments in 2016 and 2017 was "experimental and investigational" and therefore should not have been covered by the Plan.

128.   In reaching its conclusion, Optum claimed that the Participants' diagnoses had not been adequately confirmed based on its own interpretation of the Aetna clinical policy for the condition.

129.   Due to the allegedly inadequate diagnoses *under the general Aetna clinical policy*, Optum contended that the prescription drug treatments were "experimental and investigational" and therefore not covered benefits *under the Plan*.

130.   Additionally, Optum claimed that the Participants' combinations of prescription drug therapies were also "experimental and investigational" **under the Plan**, again based on Optum's own interpretation of Aetna's clinical policy for the condition and ESI's prior authorization policies.

131.   Aetna's clinical policy database, which includes the clinical policy for the condition relied upon by Optum, is publicly available on Aetna's website.  (*See* Aetna Medical Clinical Policy Bulletins, *available at* https://www.aetna.com/health-care-professionals/clinical-policy-bulletins/medical-clinical-policy-bulletins.html (last accessed June 7, 2018))

132.   The terms and conditions preceding these clinical policies expressly state that the clinical policies do ***not*** constitute the terms of any particular benefit plan, nor do they dictate coverage under a given benefit plan:

> Each benefit plan defines which services are covered, which are excluded, and which are subject to dollar caps or other limits.  Members and their providers will need to consult the member's benefit plan to determine if there are any exclusions or other benefit limitations applicable to this service or supply. . . .  ***The member's benefit plan determines coverage.***  Some plans exclude coverage for services or supplies that Aetna considers medically necessary.  ***If there is a discrepancy between a Clinical Policy Bulletin (CPB) and a member's plan of benefits, the benefits plan will govern.***

(*Id.* at Terms and Conditions pop-up window)

133.   Conflating these general guidelines with the terms of the Plan, Optum reached its own determination that the medical and prescription drug claims at issue should not have been approved and paid under the Plan and, thus, were ineligible for reimbursement under the Policy.

134.   As described above, Henkel and its designated claims administrators have the sole discretionary authority to interpret the Plan and to make coverage determinations.  With respect to the medical and prescription drug claims now at issue, the designated claims administrators—

carrying out their roles as ERISA fiduciaries to the Plan and contractual obligations to Henkel—had already interpreted the Plan and, in approving the Participants' claims at issue, had determined that none of those approved claims were experimental or investigational under the Plan.

135.   In essence, Optum decided that the Plan's fiduciary claims administrators—who made their coverage determinations under the Plan with the full panoply of the Participants' medical records available to them, and with years of ongoing engagement and communications with the Participants' healthcare providers—were wrong.

**B.     Henkel Challenges ReliaStar's Contractual Right Under The Policy To Review And Overrule The Plan's Claims Administrators' Binding Coverage Determinations.**

136.   Henkel responded to ReliaStar's improper denial of coverage under the Policy on November 13, 2017.

137.   Henkel explained that the Plan grants sole discretionary authority to Henkel as the Plan Administrator and to the Plan's designated claims administrators to make final and binding claims determinations, and that ReliaStar, which is not a fiduciary to the Plan, has no right under the Policy to review, challenge, or overrule those binding coverage determinations.

138.   Henkel further explained that ReliaStar's audit right was expressly limited by the PMCE, which, as noted above, only permits ReliaStar to deny reimbursement based on specific enumerated exclusions, all of which are inapplicable here.

139.   In addition, Henkel referred ReliaStar to case law across the country limiting stop-loss insurers' ability to overturn the discretionary coverage determinations of benefit plan fiduciary claims administrators.  Henkel also cited regulations issued by the Connecticut Department of Insurance prohibiting provisions in stop-loss insurance policies that would enable stop-loss

27

insurers to deny reimbursement of claims on the basis of the insurers' own determination that a medical or prescription drug treatment is "experimental or investigational."

140.   Henkel highlighted in its response that ReliaStar had explicitly modified its standard policy in order to comply with Connecticut's regulations by, among other things, omitting all exclusions based on "experimental and investigational" expenses both from the PMCE and from the Policy's Exclusions and Limitations provisions—the very basis on which ReliaStar was now purporting to base its denial of coverage.

141.   Following Henkel's response, the parties attempted to negotiate a renewal of the Policy for calendar year 2018, as they had done in each of the ten preceding years.

142.   During those negotiations, ReliaStar informed Henkel that it would only continue to provide stop-loss coverage for the Plan if all risk associated with medical and prescription drug claims approved under the Plan for the Participants was transferred to Henkel.

143.   Henkel refused ReliaStar's proposal, and instead bought stop-loss insurance for 2018 from a different insurer.

### C.   ReliaStar Continues To Deny Coverage Based On A Non-Existent Right To "Audit Coverage Determinations."

144.   On March 26, 2018, more than four months after Henkel's letter, ReliaStar finally responded.   ReliaStar refused to retract its coverage denial in any respect, disclaiming any obligation whatsoever for any of the Participants' expenses in 2016 or 2017—which it calculated at $47,399,942 in total for the two years.

145.   ReliaStar asserted that the Policy provided it with an unfettered right to audit the coverage determinations of the Plan's fiduciary claims administrators and to deny reimbursement based on the results of such audit.   The PMCE, ReliaStar claimed, permitted it to deny

reimbursement for any expense that it determined Henkel was not obligated to pay under the Plan, including expenses that ReliaStar determines to be "experimental or investigational."

146.   ReliaStar further asserted that its denial of coverage did not run afoul of Connecticut regulations governing stop-loss insurance policies because, it claimed, it was not denying reimbursement based on a ***Policy*** provision regarding "experimental or investigational" expenses, but on its construal and interpretation of the ***Plan***.

147.   ReliaStar went a step further, claiming that the Plan did not grant any discretionary authority to the Plan's claims administrators with respect to the determination of the underlying claims, and asserting that even if it had, such discretionary authority would not have been binding on ReliaStar because, according to ReliaStar, the Policy did not incorporate the Plan (notwithstanding ReliaStar's reliance on the Plan rather than the Policy as the purported basis for its denial of coverage under the Policy).

### D.    Henkel Reasserts Its Rights Under The Policy.

148.   Henkel responded to ReliaStar on April 26, 2018 by letter, explaining again that neither the Policy nor applicable law gave ReliaStar any contractual authority to review and overrule the underlying coverage determinations made under the Plan under the guise of an "audit" or to engage a third party to do so on ReliaStar's behalf.

149.   Henkel provided ReliaStar with documentation confirming that the official legal Plan document, the Plan, did in fact grant clear and unambiguous discretionary authority to Henkel as the Plan Administrator and to its designated claims administrators, and pointed ReliaStar to the Policy provisions that incorporate the Plan into the Policy.

150.   Finally, as detailed in Section V.A below, Henkel reiterated that ***none*** of the exclusions listed in the PMCE provide a relevant basis for ReliaStar to deny the claims at issue, and that ReliaStar's interpretation was not only inconsistent with the clear terms of the Policy but

also irreconcilable with the revisions that the Connecticut Insurance Department required ReliaStar to make to its standard policy to bring it in compliance with the state's insurance regulations.

151.    Nonetheless, ReliaStar continued to deny its contractual obligation to reimburse Henkel, and this complaint followed.

**V.    RELIASTAR HAD NO CONTRACTUAL RIGHT TO STEP IN THE SHOES OF THE PLAN'S DESIGNATED FIDUCIARIES AND MAKE AN ALTERNATIVE DETERMINATION IN ORDER TO DENY REIMBURSEMENT UNDER THE POLICY.**

**A.    Administration Of The Policy Must Mirror Administration Of The Plan.**

152.    Nothing in the Policy authorized ReliaStar to step into the shoes of the Plan's fiduciary claims administrators to reevaluate their underlying coverage determinations under the guise of a hindsight "assessment," much less to hire an outside consultant to do so.

153.    As discussed above, the Plan, which is incorporated into and made a part of the Policy, grants clear and unambiguous discretionary authority to Henkel and its designated claims administrators to interpret the Plan and to make final and binding coverage determinations under it.  (Ex. A; Plan at 4th Amend. §§ 12.1-12.2 & 3rd Amend. § 13.1)

154.    Further, the Policy provides ReliaStar with only limited audit rights that are specifically circumscribed to ensure that the reimbursement of claims under the Policy will mirror the administration of benefits under the Plan.

155.    The PMCE, as detailed above in Section II.B, is clear that expenses paid by Henkel under the Plan "***shall be considered***" eligible for reimbursement under the Policy, subject only to certain enumerated exclusions, none of which are applicable to any of the expenses in dispute here. (Ex. F; Policy at PMCE (emphasis added))

156.    The Policy includes a total of five Exclusions and Limitations, labelled "A" through "E". (*Id.* at 6)

157.   Exclusion A specifically governs situations where Henkel is not obligated to pay an expense in the first instance (or where Henkel has paid but has a valid claim for reimbursement) because an underlying medical or prescription drug treatment otherwise covered by the Plan is also covered by a second source of coverage, which may have some or all responsibility for payment.  It states:

> A. Any portion of an expense which You are not obligated to pay under the Employee Benefit Plan, or which is reimbursable to You pursuant to or because:
>   1. Another group health benefit program; or
>   2. The Covered Person or Covered Dependent is covered under, or eligible for, Medicare, the Railroad Retirement Program, Worker's Compensation, or any similar federal, state or local program or statute; or
>   3. Any coordination of benefits or non-duplication of benefits provision of the Employee Benefit Plan.

(*Id.* at 6)  None of the reimbursement claims at issue involve medical or prescription drug expenses that implicate multiple potential sources of benefit coverage.  Thus, this exclusion is inapplicable.

158.   Exclusion B, which relates to administrative expenses, excludes "[e]xpenses associated with the administration of the Employee Benefit Plan including, but not limited to, claim payment fees, PPO access fees, premium functions, medical review and consultant fees unless otherwise payable under the Reimbursement of Certain Fees provision."  (*Id.*)  As none of the reimbursement claims at issue involve expenses associated with the administration of the Plan, this exclusion too is inapplicable.

159.   Exclusion C relates to litigation-related expenses:  "Expenses Paid by You or the Claim Administrator relating to any litigation concerning the Employee Benefit Plan, including, but not limited to, attorneys' fees, legal or investigative expenses, expert fees, extra-contractual damages, compensatory damages and punitive damages."   (*Id.*)   Because none of the

31

reimbursement claims at issue relate to litigation concerning the Plan, this exclusion is inapplicable.

160.   Exclusion D, which relates to expenses incurred outside of the United States, excludes "[b]enefits Paid for expenses Incurred outside of the U.S. except in emergency situations. . . ." (*Id.*)  All of the reimbursement claims at issue involve medical and prescription drug expenses related to the treatment of the Participants in the United States.   Thus, this exclusion too is inapplicable.

161.   Finally, Exclusion E is inapplicable because it relates to "Benefits Paid under the Employee Benefit Plan for individuals who should have been, but were not, included in the most recent Disclosure Agreement." (*Id.*)  None of the reimbursement claims at issue relate to benefits paid for such individuals.

162.   In short, neither the PMCE nor the Policy's enumerated Exclusions and Limitations permit ReliaStar to deny reimbursement under the Policy based on ReliaStar's (or its consultant's) independent "experimental and investigational" determination. (*Id.* at 6, PMCE)

163.   ReliaStar has no contractual right to override a discretionary coverage determination under, or an interpretation of the terms of, the Plan made by the Plan Administrator or its designated claims administrators with its own independent interpretation of the terms of the Plan.

164.   Further, ReliaStar cannot establish that ESI abused its discretion and acted arbitrarily and capriciously in determining the dozens of underlying claims at issue.

### B.   Connecticut Regulations Limit Stop-Loss Insurer Audit Rights.

165.   ReliaStar likewise has no legal right to reevaluate whether claims approved as covered under the Plan by the Plan's designated claims administrators are "experimental and investigational."

166.   As discussed above, the Policy was "delivered in the state of Connecticut and is governed by its laws." (*Id.* at 1)

167.   Under Connecticut law, any stop-loss policy issued or delivered in the state must be approved by the Insurance Commissioner. *Conn. Gen. Stat.* § 38a-8b (2015).

168.   The key directive issued by the State of Connecticut Insurance Department related to Connecticut-based stop-loss policies is Insurance Department Bulletin HC-108 & PC-80, which states in pertinent part:

> Stop loss policies ***will not be approved*** if they contain provisions related to the following:
>
> - Claims denials that the employer is legally obligated to pay under the health plan
> - Medical necessity determinations
> - Usual or customary determinations
> - ***Experimental/investigational determinations*** . . . [or]
> - Other provisions that are deemed to be health insurance and inappropriate for an excess loss policy.

(Conn. Ins. Dep't Bulletin HC-108 & PC-80 (Nov. 12, 2015) (emphasis added)).  This bulletin replaced HC-103 & PC-79, which included the same limitations on stop-loss policies.  (Conn. Ins. Dep't Bulletin HC-103 & PC-79 (July 8, 2015)).  Both bulletins (collectively, the "Insurance Bulletins") are attached hereto as Exhibit I.

169.   The Insurance Bulletins explain the rationale behind the limitations:  "A key issue is that stop loss carriers are making individual claims determinations that may be different than those made in the underlying group health policy."  (Ex. I; Insurance Bulletins)

170.   Indeed, the Connecticut Insurance Department further explained its rationale for limiting stop-loss insurer audit rights in hearing testimony before the State Senate Committee on Insurance and Real Estate:

> A stop-loss policy does not and should not address benefits, medical necessity decisions, dollar limits or other standard of care issues. . . .   ***It would be***

> *inappropriate for the stop-loss carrier to deny a claim as eligible that was certified*
> *as medically necessary by the health insurance plan, but then overturned as not*
> *medically necessary by the stop-loss carrier*.

(*An Act Concerning Stop Loss Insurance for Health Care or Medical Benefits: Hearing on Senate*

*Bill 926 Before the Ins. and Real Estate Comm.* (Conn. 2017) (testimony of the Conn. Ins. Dep't)

at 1-2 (emphasis added), attached hereto as Exhibit J)

171.   Thus, to comply with the state's stop-loss insurance regulations, ReliaStar

specifically modified the terms of the Policy by, among other things, removing any exclusions on

the basis of "experimental and investigational" or "medical necessity" determinations.  (*See infra*

Section II.C)

172.   In fact, ReliaStar made these modifications *at the insistence of* the Connecticut

Department of Insurance.  When ReliaStar sought approval from the state for a stop-loss policy

that included language related to "experimental or investigational" and "medically necessary"

determinations, the Connecticut Insurance Principal Examiner rejected the policy, stating that it

was "not in complete conformity with Insurance Bulletin HC-103" because it "*excludes* expenses

deemed Experimental or Investigational and also *retains the option to determine* whether incurred

expenses were Medically Necessary or not."  (Conn. Ins. Principal Examiner Objection Ltr. to

ReliaStar (10/02/15) (emphasis added), attached hereto at Exhibit K)

173.   The Insurance Principal Examiner explained:

If the underlying self-insured benefit plan provides benefits for experimental or
investigational related expenses, then the excess loss contract must also recognize
such expenses as covered expenses.  *Similarly, if the self-insured benefit plan*
*provides coverage for expenses that it deems medically necessary according to its*
*terms, then the excess loss contract must also recognize such expenses.  The*
*excess loss carrier may not second guess the underlying self-insured benefit*
*plan's determination*, providing the determination is in accord with the terms of
the self-insured benefit plan.  Please amend the subject endorsement to address this
objection.

34

(*Id.* (emphasis added))

174.   In response, ReliaStar assured the Department of Insurance that "[t]he provisions regarding Experimental or Investigational expenses and the provisions where we retain the option to determine whether incurred expenses were Medically Necessary . . . ***will [be] exclude[d]*** . . . from policies issued or renewed effective January 1, 2016 and after." (*Id.* at ReliaStar Response Ltr. to Conn. Ins. Principal Examiner (10/15/2015) (emphasis added))

175.   Thus, ReliaStar explicitly and intentionally omitted any provisions where it excludes expenses deemed "Experimental or Investigational" and likewise intentionally omitted any provisions where it "retain[s] the option to determine" whether expenses were "Medically Necessary." (*Id.*)

176.   The Connecticut Department of Insurance ultimately approved the Policy with those modifications and that understanding.

**C.     Connecticut's Stop-Loss Insurance Regulations Are Consistent With Public Policy.**

177.   The limitations imposed on ReliaStar's audit rights through the PMCE and through the Policy's omission of any right to exclude coverage on the basis of "experimental and investigational" or "medical necessity" determinations is consistent with the Policy's express declaration that ReliaStar is ***not*** a fiduciary to the Plan.

178.   The Policy is explicit:  "[ReliaStar is] not a Plan Administrator or Fiduciary with respect to the Employee Benefit Plan as those terms are used in the Employee Retirement Income Security Act of 1974, as amended." (Ex. F; Policy at 1)

179.   By contrast, the Plan is governed by ERISA, which imposes fiduciary duties on the Plan's fiduciaries to act "solely in the interest of the participants and beneficiaries, and [] for the

exclusive purpose of [] providing benefits to participants and their beneficiaries[,] and [] defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a).

180.    Accordingly, the Plan's designated fiduciary claims administrators, Aetna and ESI, are obligated to act on behalf of the Plan and all of its participants when exercising their discretionary authority to make coverage determinations.

181.    In contrast, neither ReliaStar nor Optum were ever fiduciaries to the Plan.  Quite the opposite.  As a stop-loss insurer, ReliaStar was financially incentivized to deny claims for reimbursement under the Policy and was never bound by any fiduciary obligations to the Plan or its participants.

182.    Consistent with ReliaStar's non-fiduciary role, with the Plan's delegation of sole discretionary authority to Henkel as the Plan Administrator and its designated claims administrators to construe and interpret the Plan and render final and binding claims determinations under it, and with the Connecticut Department of Insurance regulations limiting the authority of stop-loss insurers, no provision in the Policy entitled ReliaStar to reevaluate the Plan administrators' discretionary coverage determinations (or to engage a third party consultant to do so on its behalf), much less to overrule those determinations in order to deny reimbursement under the Policy.

183.    Nowhere does the Policy curtail the valuable and necessary protection provided by the stop-loss coverage that Henkel paid for by giving ReliaStar the right to audit the discretionary coverage determinations made by the Plan's designated claims administrators.  Likewise, the Policy contains no provision allowing ReliaStar to deny reimbursement for claims under the Policy based on its own independent interpretation of the Plan's terms.

184.   The Policy, bound by the PMCE, provides for just the opposite—limited audit rights that ensure that coverage determinations approved by the Plan are honored under the Policy.

185.   ReliaStar's calculated effort to avoid the risk it contracted to assume by replacing the Plan's coverage determinations with its own self-interested interpretation is a clear breach of the Policy.

186.   Further, ReliaStar's calculated denial of coverage in the wake of the express modifications ReliaStar was required to make to the Policy by the Connecticut Insurance Department to prevent this very situation from occurring is a clear violation of the Connecticut Unfair Trade Practices Act and the Connecticut Unfair Insurance Practices Act.

## VI.   ESI'S APPROVAL OF THE PARTICIPANTS' PRESCRIPTION DRUG CLAIMS

### A.   ESI Owed A Fiduciary Duty To The Plan And A Contractual Duty To Henkel.

187.   ESI describes itself as "the largest independent manager of pharmacy benefits in the United States"[2] offering "specialized expertise, deep insights, active listening and meticulous data analysis" to its 3,000 clients and 100 million members.[3]

188.   ESI specifically markets its pharmacy benefit administration practice to companies with self-funded benefit plans, emphasizing that its "tenured, client-centric and dedicated account teams have decades of experience supporting employers of all shapes and sizes . . . [and] significant experience managing complex plan designs, supporting tailored solutions, and integrating data and coordinating care with healthcare providers."[4]

---

[2]   ESI Homepage Screenshot, *available at* https://www.express-scripts.com/.

[3]   ESI Corporate Overview Download, *available at* https://lab.express-scripts.com/about.

[4]   ESI Plan Sponsors-Self-Funded Plans Screenshot, *available at* https://lab.express-scripts.com/plan-sponsors/self-funded-plans.

189.   For more than a decade, Henkel has depended on ESI's claims administration expertise in making claims determinations under the Plan—to evaluate claims for prescription drug benefits submitted by Plan participants, to make coverage determinations, and to provide ongoing drug utilization review of Plan participants' prescription drug treatments.

190.   Beyond its administrative and technical expertise, ESI's claims administration role is also indispensable to the Plan because, as the Plan provides, "[t]he third party administrators of self-funded group health benefits shall handle most health care administrative functions involving PHI with no involvement of [Henkel] or its employees." (Ex. A, Plan at § 11.8).

191.   As an entity to which discretionary authority has been delegated to interpret the ERISA-governed Plan's coverage terms and to determine Plan coverage for prescription drug benefit claims based on its interpretation, ESI is a fiduciary of the Plan and owes a fiduciary duty to the Plan and its participants to discharge its obligations "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of providing benefits to participants and their beneficiaries, and defraying reasonable expenses of administering the plan."  29 U.S.C. § 1104(a)(1).

192.   In carrying out its functions as the Plan's claims administrator for prescription drug benefits, ESI was required to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims" and "in accordance with the documents and instruments governing the plan." *Id.*

193.   In addition to its designation as the claims administrator for prescription drug benefits under the Plan, ESI's fiduciary status is confirmed through the very nature of the

functional role ESI has performed for more than a decade as the Plan's designated claims administrator for prescription drug benefits.

194.   Determining participant claims as the Plan's prescription drug claims administrator requires ESI to evaluate and weigh a number of considerations, particularly where, as here, the prescription drugs at issue require prior authorization before they are deemed covered and may be dispensed to a Plan participant.

195.   To determine whether a given drug prescribed to a given participant is covered under the Plan, ESI must not only confirm that the prescribed drug is included on the formulary but then must also interpret, exercising its discretionary authority, whether the treatment prescribed to the Plan participant is medically necessary and not experimental and investigational, which requires engagement with the participant's treating physicians, evaluation of the participant's clinical and diagnostic information in the context of the drug's clinical criteria for coverage, and ongoing drug utilization review to monitor the ongoing efficacy of the drug in treating the participant's condition.

196.   ESI evaluated the Participants' prescription drug claims at issue under the Plan, relying on its clinical expertise, its experience in administering self-funded plans like Henkel's, and its institutional understanding of the Participants' medical condition and the drugs prescribed to treat it, and in that evaluation process, ESI exercised discretionary control over interpreting the Plan's terms in making the ultimate determination that the prescription drug claims at issue were covered under the Plan.

197.  ESI summarized its extensive and ongoing evaluation of the Participants' prescription drug claims at issue in a presentation provided to Henkel in September 2017, which is attached hereto as Exhibit L.

198.   ESI's presentation ██████████ Redacted ██████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████ (Ex. L; ESI Presentation)

199.   ESI additionally owed a contractual duty to Henkel to carry out certain responsibilities in accordance with the terms of the parties' operative contracts, including the IPDPA, PBMA and their respective amendments and addenda.

200.   ESI's responsibilities are enumerated in its contracts with Henkel and include, among other things:

████████████████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████

███████ █████████████████████████████████████████
███████████████

**B.     ESI Wrongfully Approved The Prescription Drugs At Issue.**

201.    In the alternative to its claims against ReliaStar, Henkel pleads that ESI wrongfully approved the prescription drugs at issue, breaching its fiduciary duties to the Plan and its contractual duties to Henkel.

202.    In 2016 and 2017, ESI evaluated and approved over $49 million for the prescription drug treatment of the Participants' condition.

203.    Throughout 2016 and 2017, each of the prescription drugs prescribed for treatment of the Participants' condition required prior authorization by ESI prior to approval.

204.    ESI was contractually obligated to ███████████████████████████ ████████████████████████████



███████████████

205.    ██████████████████████████████████████

███████████████ Henkel had no input in the development, review, approval or implementation of those policies.  As described above, ESI's Prior Authorization Policies are highly technical documents, which are developed and approved by ESI's internal Therapeutic Assessment Committee, stamped as "proprietary and confidential to Express Scripts Holding Company" and copyright-protected by ESI.  (*E.g.*, Ex. E, Prior Authorization Policy for ███████

206.   Each Prior Authorization Policy includes specific clinical coverage criteria developed and employed by ESI to evaluate and determine whether to approve or deny Plan participant prescriptions for the drug addressed by the Prior Authorization Policy.

207.   The condition for which the two Participants were treated with the drugs at issue ██████████ ████████████████████████████████████████████████████████

██████████████████████████████

208.   At the start of their treatments, both Participants ██████████ ████████████

████████████████████████████████████████████████████████ ████████ of the condition.

209.   The clinical coverage criteria in ESI's Prior Authorization Policies, however,

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████.

210.   ESI knew (1) that the Participants had ████████ of the condition and (2) that its Prior Authorization Policies ████████████████████████████████████████████████████

████████ Despite knowing that the clinical criteria in its Prior Authorization Policies required the claims for the drugs to be denied, ESI went ahead and approved them.

211.   In mid-March 2017, ESI and/or Accredo conducted "████ Baseline Clinical Assessments" on the two Participants, which included, among other things, ██████████ ████████

██████████████████████████████████████.   Those completed "████ Baseline Clinical Assessments" confirmed—██████████████████████████████████████████████████████

████████ ██████████████

212.   Nevertheless, between 2015, when the course of treatment at issue began, and the end of 2017, ESI did not raise any concerns to Henkel regarding any aspect of the Participants' treatment or any issues concerning ESI's ongoing approval of the claims at issue.  To the contrary,

ESI continued to approve these claims, even though it was aware that the Participants had ███ ██ of the condition and even after it became aware in June 2017 that ReliaStar had retained Optum to conduct its claims review.

213.   Indeed, even after ReliaStar denied coverage and provided the Optum review challenging, among other things, Redacted, ESI insisted that it would continue to approve the Participants' claims in the future unless and until Henkel amended the Plan to limit available coverage for the drugs at issue—all while ESI knew that the Participants did not meet the coverage criteria in ESI's Prior Authorization Policies.

214.   In undertaking its coverage review and arriving at its findings, Optum reviewed and referenced the ESI Prior Authorization Policies for each of the drugs at issue.  (Ex. H; Optum Review at 3)

215.   As Optum noted, Redacted ██████ of the condition.  (*Id.* at at 4)  However, that Redacted ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████. (*Id.* at 4, 6-7)  ReliaStar denied stop loss coverage for the disputed claims on this basis, asserting that the treatment was not a covered benefit because it was "experimental and investigational."

216.   For the reasons set forth in the Optum report, the Participants' Redacted ████████████████████████████████████t and ESI therefore breached its duties in approving the claims at issue.

217.   Throughout the first quarter of 2017, Henkel, both on its own and through its benefits broker and consultant Mercer, communicated frequently with ESI regarding the

significant increase in the Participants' prescription drug expenses at the end of 2016 and beginning of 2017. ESI repeatedly assured Henkel that it believed the claims were valid and were being administered appropriately.

218. However, on information and belief, ESI and its subsidiary Accredo failed to obtain

Redacted ████████████████████████████████████████████████

████████████████████████████ Redacted ██████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████ (Exhibit M, 09/08/2017 Email Chain). Nonetheless, ESI continued to approve the prescription drug claims to treat the condition, allowing the costs to mount higher and higher.

219. In addition, ESI ignored the requirement in its Prior Authorization policies that ██

████████████████████████████████████████████████████████████

████████████████████████████ Instead of applying the requirement that it had drafted, ESI approved prescriptions Redacted ██████████████

220. Internal ESI and Accredo communications show that Redacted ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

(Exhibit N, 09/07/2017 Instant Message Conversation). Nonetheless, ESI failed to investigate, and never informed Henkel about, its suspicions. Instead, ESI continued to approve and dispense the prescription drugs at issue through the end of 2017.

221. Both ESI and its subsidiary Accredo were also fully aware of the Redacted ██████

████████ they were approving for the Participants and the astronomical cost they were saddling

Henkel with.  ESI and Accredo noted in internal communications that [Redacted]

[Redacted] [Redacted] (Exhibit O, 02/13/2017

Email) and that [Redacted]

[Redacted] (Exhibit P, 02/20/2017 Email)

222.  [Redacted]

[Redacted] (Exhibit Q, 03/13/2017

Email Chain)

223.  Indeed, in 2017, senior employees at ESI and Accredo, including Accredo's

Clinical Director, discussed in internal communications that [Redacted]

[Redacted]

(Exhibit R, 09/27/2017 Email Chain)

224.  Optum also identified still more deficiencies in the ongoing evaluation and review

of the Participants' drug utilizations.  Following its review of ESI's claims data for the two

Participants from 2016 and 2017, Optum concluded: [Redacted]

[Redacted]" (Ex.

H; Optum Review at 7)

225.  Optum also concluded that ESI violated its own dosing policies.  As Optum

observed, [Redacted]

This made

the doses <span style="color:red">Redacted</span> ███████████████████████████

████████████████████████████████████████████████████

███████████████████████████████ █████.” (*Id.* at 5-8)

226.   Finally, Optum determined that the Participants' concurrent use of the drugs at issue was also "experimental and investigational".  (Ex. H; Optum Review at 4 (referencing Aetna's Medical Policy on ████████████████████))

227.   As set forth in the Optum report and as further evidenced by internal ESI and Accredo communications, ESI and its subsidiary Accredo failed to investigate—and never shared with Henkel—its own internal assessment that <span style="color:red">Redacted</span> ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████, opting instead to continue to approve the prescription drugs at issue, and in the process breaching its duties as claims administrator.

228.   In total, ESI approved $48,949,944.30 in prescription drug claims submitted by the Participants in 2016 and 2017, all of which were paid in their entirety by the Plan, and all based on ESI's determination that they were for benefits covered under the terms of Plan.

229.   ESI failed to exercise the requisite care, prudence and diligence required by ERISA and breached its fiduciary duties to the Plan by initially approving the Participants' claims under the Plan, by continuing to approve the Participants' claims through the end of 2017 without adhering to the clinical criteria in its Prior Authorization Policies, and by ignoring the numerous red flags surrounding the diagnosis, dosages, drug combinations, and overall efficacy of the prescribed treatment.  In so doing, ESI abused its discretion and acted arbitrarily and capriciously.

230.   Further, by initially approving the Participants' claims under the Plan and by continuing to approve the Participants' claims through the end of 2017 in a manner inconsistent with ESI's own clinical coverage policies, ESI breached the contractual duties it owed to Henkel as the Plan Administrator under the IPDPA, the PBMA and their respective amendments and addenda.

## COUNT I
### (Breach of Contract Against ReliaStar)

231.   Henkel repeats the allegations contained in paragraphs 1-24 and 28-186 as if fully set forth herein.

232.   The Policy is a binding and enforceable contract between Henkel and ReliaStar.

233.   Henkel performed its obligations under the contract by paying monthly premiums to ReliaStar and by submitting timely claims for reimbursement of medical and prescription drug expenses approved and paid under the Plan with all of the required documentation pursuant to the terms of the Policy.

234.   The premiums paid by Henkel to ReliaStar provided valuable consideration for the parties' agreement.

235.   Consistent with the terms of the Policy, each claim that Henkel submitted to ReliaStar for reimbursement for each of the Participants' medical and prescription drug expenses was only submitted to ReliaStar after it had been (1) approved for coverage according to the terms of the Plan by the Plan's designated claims administrators, exercising their discretionary authority to interpret the Plan's terms and make final and binding claims determinations, subject to their fiduciary obligations under the Plan and contractual obligations under their respective contracts with Henkel, and applicable law, and (2) paid by Henkel.

236.   The contract between Henkel and ReliaStar did not provide ReliaStar with the contractual right to reevaluate the underlying coverage determinations made by the Plan's designated claims administrators, nor to overrule those determinations once made.

237.   ReliaStar's audit right under the Policy was limited by the PMCE, which was expressly incorporated into the Policy and which required ReliaStar to reimburse Henkel for all expenses paid by Henkel, subject only to specific enumerated exclusions listed in the PMCE and reflected in the Exclusions and Limitations section of the Policy, none of which are applicable to expenses at issue here.

238.   ReliaStar intentionally omitted from the Policy any provisions related to "experimental and investigational" and "medical necessity" determinations.

239.   Thus, by denying reimbursement for Henkel's claims based on its improper review of the underlying claims determinations and its independent determination that the underlying medical and prescription drug benefits were "experimental and investigational," ReliaStar breached its contract with Henkel.

240.   As a direct result of ReliaStar's breach, Henkel has been deprived of more than $47 million in stop-loss reimbursements to which it is entitled.

### COUNT II
**(Declaratory Judgment Against ReliaStar)**

241.   Plaintiff repeats the allegations contained in paragraphs 1-24, 28-186, and 231-240 as if fully set forth herein.

242.   As a result of the foregoing facts, there is an actual controversy between Henkel and ReliaStar regarding the respective rights and obligations of the parties under the Policy. Judgment in this regard would clarify the legal issues involved, finalize the controversy, and offer relief from uncertainty.

243.   The issue is fit for judicial decision and if decision is withheld, Henkel's economic interests will continue to suffer.

244.   Pursuant to 28 U.S.C. § 2201(a) (Declaratory Judgment Act), Henkel seeks a declaration (a) that the Policy does not give ReliaStar the right to interpret the Plan's terms and make coverage determinations for medical and prescription drug expenses under it, (b) that the Policy does not give ReliaStar the right to overrule underlying coverage determinations made by the Plan's designated claims administrators in order to deny reimbursement under the Policy, and (c) that the Policy does not give ReliaStar the right to deny reimbursement of stop-loss claims on the basis of ReliaStar's (or its third party consultant's) determination that the underlying expenses were "experimental and investigational" based on its (or its consultant's) own interpretation of the Plan.

## COUNT III
### (Violation of the Connecticut Unfair Trade Practices Act and Connecticut Unfair Insurance Practices Act Against ReliaStar)

245.   Plaintiff repeats the allegations contained in paragraphs 1-24, 28-186, and 231-244 and 231-244 as if fully set forth herein.

246.   ReliaStar's stop-loss Policy with Henkel was delivered in Connecticut and is governed by Connecticut law.  (Ex. F; Policy at 1)

247.   The Connecticut Insurance Department prohibits stop-loss insurers from issuing policies with provisions related to "Experimental or Investigational" or "Medical Necessity" determinations.  (Ex. I; Insurance Bulletin HC-108 & PC-80)

248.  ReliaStar affirmatively represented to the Connecticut Insurance Principal Examiner that it would exclude all "provisions regarding Experimental or Investigational expenses

and the provisions where we retain the option to determine whether incurred expenses were Medically Necessary[.]"  (Ex. K; Response Letter (10/15/2015))

249.    ReliaStar thereupon omitted all provisions from the Policy, including in the Policy's Exclusions and Limitations section and in the PMCE, which would have purported to allow ReliaStar to deny coverage on the basis of "Experimental and Investigational" or "Medical Necessity" determinations.  (Ex. F; Policy at 6, PMCE)

250.    In addition, through its inclusion of the PMCE in the Policy, ReliaStar affirmatively represented to Henkel that, other than in the narrowly defined circumstances enumerated in that endorsement, ReliaStar would consider all expenses Paid by Henkel to be Eligible Excess Risk Expenses, and thus would be bound by the determinations of the Plan's fiduciary claims administrators.

251.    ReliaStar did not challenge—and paid—expenses related to Participant One's treatment of the same condition in 2015.

252.    From the issuance of the Policy in 2013 through its termination at the end of 2017, Henkel paid millions of dollars in premiums to ReliaStar to manage the risk of high-dollar medical and prescription drug claims.

253.    At all times relevant to this dispute, Henkel has reasonably relied on ReliaStar's representations in the PMCE, as well as on ReliaStar's omission of all provisions from the Policy related to "Experimental and Investigational" and "Medical Necessity" consistent with the state of Connecticut's regulation of stop-loss insurers, believing that ReliaStar would honor its obligation to reimburse claims determined to be covered under the Plan by the Plan's fiduciary claims administrators.

254.   Nevertheless, ReliaStar has denied Henkel's claims for reimbursement based on its own impermissible interpretation of the terms of the Plan and determination of coverage under it.

255.   By knowingly misrepresenting the conditions or terms of its insurance Policy, ReliaStar has engaged in conduct proscribed by the Connecticut Unfair Insurance Practices Act. *Conn. Gen. Stat.* § 38a-816(1).

256.   By engaging in this conduct prohibited by the Connecticut Unfair Insurance Practice Act, ReliaStar has also violated the Connecticut Unfair Trade Practices Act.  *Conn. Gen. Stat.* § 42-110b(a).

257.   As a direct result of ReliaStar's unfair and deceptive acts and practices, Henkel has suffered an ascertainable loss of money or property, including loss of reimbursement expenses owed pursuant to the Policy, as well as related court costs and attorney's fees to bring suit to litigate its claim, and the loss of interest on funds due under the Policy.

258.   Further, ReliaStar's conduct was willful, wanton, intentional, and malicious and warrants an award of punitive damages pursuant to *Conn. Gen. Stat.* § 42-110g(a).

259.   Prior to securing approval for its Connecticut-sited stop-loss policy from the state Insurance Commissioner, ReliaStar was required to omit any policy language related to the determination of "Experimental and Investigational" and "Medically Necessary" expenses.

260.   In light of its communications with the Connecticut Department of Insurance, ReliaStar was fully aware that it was prohibited from "exclude[ing] expenses deemed Experimental or Investigational" or "retain[ing] the option to determine" whether expenses were "medically necessary."

261.   ReliaStar's decision to deny reimbursement to Henkel on the basis of its own determination that the underlying claims—each of which was determined to be covered under the

terms of the Plan by the Plan's fiduciary claims administrators—are "Experimental and Investigational" is a clear and direct violation of the Commissioner's directive.

262.   Further, in the course of ReliaStar's written communications with Henkel, ReliaStar has purported to base its denial of coverage on "Experimental and Investigational" language in the Plan while simultaneously asserting that the Plan's grant of discretionary authority does not bind ReliaStar.

263.   Likewise, with full awareness of the high-dollar Participants and their ongoing treatment needs and expenses, upon information and belief, ReliaStar stalled in denying reimbursement for any of the expenses in dispute until after it had already secured Henkel's agreement to the higher premiums and deductibles for the 2017 renewal.

264.   Upon the commencement of this action, Henkel sent a copy of the complaint to the Attorney General and the Commissioner of Consumer Protection, pursuant to *Conn. Gen. Stat.* § 42-110g(c).

## <u>COUNT IV</u>
### (Violation of the Connecticut Unfair Trade Practices Act Against ReliaStar)

265.   Plaintiff repeats the allegations contained in paragraphs 1-24, 28-186, and 231-264 as if fully set forth herein.

266.   By invoking exclusions that it expressly omitted from the Policy, ReliaStar has deliberately flouted the clear directives of the Connecticut Insurance Department and reneged on the representations it made both to Henkel and the State's Insurance Commissioner.

267.   Further, ReliaStar delayed in denying reimbursement for or otherwise challenging any of the Participants' claims and expenses in dispute in order to extract a $25,000 increase in individual deductibles and over half a million dollars in increased premiums for the 2017 Policy renewal from Henkel.

268.   By engaging in the aforesaid conduct, ReliaStar has committed a violation of the Connecticut Unfair Trade Practices Act, *Conn. Gen. Stat.* § 42-110b(a), in that the aforesaid conduct is immoral, unethical, oppressive and/or unscrupulous, and/or has caused substantial injury to Henkel that could not have reasonably been avoided by Henkel, and is not outweighed by any countervailing benefit.

269.   ReliaStar's conduct was willful, wanton, intentional and malicious and warrants an award of punitive damages pursuant to *Conn. Gen. Stat.* § 42-110g(a).

270.   Upon the commencement of this action, Henkel sent a copy of the complaint to the Attorney General and the Commissioner of Consumer Protection, pursuant to *Conn. Gen. Stat.* § 42-110g(c).

## COUNT V
### (Breach of ERISA Fiduciary Duty Against ESI)

271.   Plaintiff repeats the allegations contained in paragraphs 1-23, 25-151, and 187-230 as if fully set forth herein.

272.   ESI is an ERISA fiduciary under the express terms of the IPDPA as amended. Under the IPDPA, ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████ Moreover, the IPDPA provides that ████████████████████████ ████████████████████████████████████████████ ████████████████████████████

273.   ESI is also an ERISA fiduciary under 29 U.S.C. §§ 1002(21)(A) and 1102(a)(2) by virtue of the functional role it has performed for more than a decade as the designated claims

administrator for prescription drug benefits under the Plan, including with respect to the discretionary benefits determinations it made under the Plan with respect to the Participants' prescription drug claims at issue.

274.   In this role, ESI and/or its agents, delegates, or designees, including Accredo, employed their specialized expertise as claims administrators and clinical specialists and, relying on its own proprietary clinical criteria and Prior Authorization Policies, made discretionary decisions with respect to, among other items, prescription approval, dose justification, plan interpretation, and the clinical course of treatment for the Participants' conditions in determining that their prescription drug treatments were payable under the terms of the Plan.

275.   Henkel is the Plan sponsor and ERISA "named fiduciary" under the Plan pursuant to § 1102(a), having retained certain discretionary authority and control with respect to the management and administration of the Plan that is not delegated to its claims administrators.

276.   As an ERISA fiduciary with respect to the Plan and in a representative capacity on behalf of the Plan, Henkel has standing to sue ESI under 29 U.S.C. §§ 1132(a)(2).

277.   The Plan is an employee welfare benefit plan pursuant to 29 U.S.C. § 1002(1), which is governed by ERISA.

278.   As an ERISA fiduciary to the Plan, ESI is obligated to discharge its duties to the Plan "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of providing benefits to participants and their beneficiaries, and defraying reasonable expenses of administering the plan;" in addition, ESI must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims"

and "in accordance with the documents and instruments governing the plan." 29 U.S.C. § 1104(a)(1).

279.   By failing to adhere to the clinical criteria in its Prior Authorization Policies and ignoring the numerous red flags surrounding the diagnosis, dosages, drug combinations, and overall efficacy of the prescribed treatment as described above in paragraphs 201-230, ESI breached its fiduciary duties to the Plan.  In so doing, ESI abused its discretion and acted arbitrarily and capriciously.

280.   As a direct and proximate result of the breaches of fiduciary duty alleged herein in the alternative, the Plan incurred substantial losses.

281.   Pursuant to 29 U.S.C. § 1109, ESI "shall be personally liable to make good to such plan any losses to the plan resulting from such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary."

## COUNT VI
### (Breach of Contract Against ESI)

282.   Plaintiff repeats the allegations contained in paragraphs 1-23, 25-151, and 187-230 as if fully set forth herein.

283.   The IPDPA, together with amendments and addenda thereto, is a binding and enforceable contract between Henkel and ESI.

284.   The PBMA, together with amendments and addenda thereto, is a binding and enforceable contract between Henkel and ESI.

█████ Henkel performed all obligations under the IPDPA, PBMA, and their respective amendments and addenda, including █████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

286.   The amounts paid by Henkel to ESI for claim reimbursement and for all administrative services, clinical program, dispensing, program management, additional PBM services provided to Henkel, and appeal-related fees provided valuable consideration for the parties' agreements.

287.   ESI's obligations and responsibilities as Henkel's designated claims administrator for prescription drug benefits are enumerated in the IPDPA, PBMA, and their respective amendments and addenda and include, among other things:



████████████████████████████████████████████████████████

████████████████████

288.  Pursuant to addenda to the IPDPA and PBMA, ███████████████████

████████████████████████████████████████████████████████

███████

289.  ESI's prior authorization services under the parties' contracts obligated ESI to

████████████████████████████████████████████████████████

███████████████████████████

290.  Each Prior Authorization Policy for the drugs at issue includes specific clinical

coverage criteria developed and employed by ESI to evaluate and determine whether to approve

or deny the Participants' prescribed drug treatments.

291.  Although the Participants' respective Redacted ███████████████████

████████ of their condition, the clinical coverage criteria in ESI's Prior Authorization Policies

for each of the drugs at issue ████████████████████████████████

████████████████████████████████████████████████████████

████████████

292.  As a result, ESI's initial approval of prior authorization for the Participants'

respective treatment with the drugs at issue is facially inconsistent with the Participants' diagnoses,

and thus, ESI failed to follow its Prior Authorization Policies when determining the Participants'

prescription drugs claims at issue.

293.  Further, despite ESI's contractual obligation to ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████ between

2015, when the course of treatment at issue began, and the end of 2017, ESI did not raise any concerns to Henkel regarding any aspect of the Participants' treatment or any issues concerning ESI's ongoing approval of the claims, notwithstanding the information they had and intentionally withheld from Henkel as set forth above.

294.   ESI breached the contractual duties it owed to Henkel under the IPDPA, the PBMA and their respective amendments and addenda by the conduct alleged above, including by initially approving the Participants' claims under the Plan; by continuing to approve the Participants' claims through the end of 2017 in a manner inconsistent with the clinical criteria set forth in ESI's own Prior Authorization Policies; and by failing to perform standard drug utilization review,.

295.   As a direct and proximate result of ESI's contractual breaches, Henkel has been deprived of $48,949,944.30 in prescription drug claims submitted by the Participants in 2016 and 2017.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter an Order granting the following relief against ReliaStar:

a.   Declaring that the Policy did not give ReliaStar the right to interpret the Plan's terms and make coverage determinations for medical and prescription drug expenses under the Plan.

b.   Declaring that the Policy did not give ReliaStar the right to overrule the discretionary coverage determinations made by the Plan through its designated claims administrators.

c.   Declaring that the Policy did not give ReliaStar the right to deny reimbursement of stop-loss claims on the basis of ReliaStar's determination that the underlying expenses were "experimental and investigational."

d.   Awarding full recovery of the more than $47 million in claims that ReliaStar has improperly refused to reimburse under the Policy, the precise amount to be determined at trial.

e.   Awarding reasonable attorneys' fees pursuant to *Conn. Gen. Stat.* § 42-110g(d).

e.   Awarding punitive damages pursuant to *Conn. Gen. Stat.* § 42-110g(a).

f.   Awarding such other and further relief as may be just and proper, including pre-judgment and post-judgment interest on the above amount.

WHEREFORE, in the alternative to its claims against ReliaStar, Plaintiff, on behalf of the

Plan and the Plan's participants, respectfully requests that the Court enter an Order granting the

following relief against ESI:

a.   Requiring ESI to compensate the Plan for all losses arising from its breach of its fiduciary duties pursuant to 29 U.S.C. § 1109(a) or, alternatively, requiring ESI to compensate Henkel for all losses arising from its breaches of its contractual obligations to Henkel under the IPDPA, PBMA, and their respective amendments and addenda.

b.   Awarding such equitable relief as the Court deems just and appropriate pursuant to the common law and 29 U.S.C. § 1109(a).

c.   Awarding reasonable attorneys' fees pursuant to 29 U.S.C. § 1132(g)(1).

d.   Awarding such other and further relief as may be just and proper, including pre-judgment and post-judgment interest on the above amount.

## <u>JURY TRIAL DEMAND</u>

Plaintiff hereby demands a trial by jury.

Dated:  April 8, 2020

HENKEL OF AMERICA, INC.,


_____/s/ Timothy A. Diemand_____
Timothy A. Diemand (Connecticut Bar #18075)
WIGGIN AND DANA LLP
20 Church Street
Hartford, Connecticut 06103
Phone:  860.297.3700
Facsimile:  860.585.9380
Email:  tdiemand@wiggin.com

Nader R. Boulos, P.C. (phv09664)
John R. Worth (phv09661)
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, Illinois 60654
Phone:  312.862.2000
Facsimile:  312.862.2200
Email:  nboulos@kirkland.com
        jworth@kirkland.com

*Counsel for Henkel of America, Inc.*