**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| HENKEL OF AMERICA, INC., <br> *Plaintiff*, <br><br> v. <br><br> RELIASTAR LIFE INS. CO. and <br> EXPRESS SCRIPTS, INC., <br> *Defendants*. | No. 3:18-cv-965 (JAM) |

**RULING ON MOTIONS FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Henkel of America, Inc. decided to self-insure. Rather than pay for its workers and their families to get health insurance from a third party, it covered their healthcare costs directly. But this decision proved costly. Two of Henkel's health plan participants were treated with ultra-expensive prescription drugs. And now Henkel is out about $50 million.

Henkel wants two other companies to foot the bill: the ReliaStar Life Insurance Company— Henkel's own stop-loss insurer—and Express Scripts Inc.—the pharmacy benefits manager that Henkel says wrongly approved the costly prescriptions. But they refused to pay, so Henkel has sued them.

All three parties have moved for partial summary judgment. I will deny the motion of Express Scripts but grant and deny in part the motions of Henkel and ReliaStar.

**BACKGROUND**

Henkel is a chemical manufacturer. Although it pays for its healthcare plan, it hires other companies to run the plan. It hired Express Scripts, a major pharmacy benefits manager, to process its workers' prescription drug claims. And to protect against huge losses, it bought stop-loss insurance from ReliaStar. Under Henkel's stop-loss policy, ReliaStar agreed to cover certain

1

exorbitant medical claims. *See Henkel of America, Inc. v. ReliaStar Life Ins. Co.*, 2021 WL 2857503 at *1, *5 (D. Conn. 2021).

This case is about whether Express Scripts was right or within its discretion to approve some staggering prescription claims—and if not, then who should pay. Two health plan participants fell ill. They were diagnosed with hereditary angioedema, a blood disease. From 2015 to 2017, their doctors prescribed them extremely high dosages of six rare and expensive medicines. Express Scripts processed the prescriptions and approved each one. It then sent the prescriptions to Accredo, its subsidiary pharmacy. Accredo dispensed the drugs, and Henkel paid for them. In all, the drugs cost over $50 million. *See id.* at *1, *3-4.

As the claims poured in, Henkel invoked its stop-loss policy and asked ReliaStar for reimbursement. At first, ReliaStar covered the drugs. But after 2015, it refused to, claiming that the drugs were not authorized under Henkel's healthcare plan. Henkel should not have covered the drugs, it said, and now Henkel should foot the bill. *Id.* at *5.

Henkel disagrees and has sued. Henkel claims that ReliaStar breached the insurance contract (Count I) and violated both the Connecticut Unfair Insurance Practices Act (CUIPA) (Count III) and the Connecticut Unfair Trade Practices Act (CUTPA) (Count IV). Henkel also seeks a declaratory judgment about the meaning of its policy (Count II).[1]

In addition to suing ReliaStar, Henkel sues Express Scripts for breach of contract (Count VI) and breach of fiduciary duty under the Employee Retirement Income Security Act (ERISA) (Count V).[2] It claims that Express Scripts erred in approving the drugs.

---

[1] Doc. #147 at 47–53.
[2] *Id.* at 53–58.

Mid-discovery, Express Scripts moved for summary judgment, arguing that it was right to approve the drugs. I denied the motion and then denied reconsideration.[3] With discovery now over, all three parties have moved for partial summary judgment.[4]

## DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide whether those facts would be enough—if eventually proved at trial—to allow a reasonable jury or other factfinder to decide the case in favor of the opposing party.[5] My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues but solely to decide whether there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (*per curiam*); *Pollard v. N.Y. Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).[6]

### *Express Scripts' motion for partial summary judgment*

Last time, I ruled that there was a genuine dispute whether Express Scripts was right to approve the drugs. In its new motion, Express Scripts claims that it "does not seek to re-litigate" that issue.[7] Instead, it has broken its motion into discrete points for which it seeks summary

---

[3] Docs. #243, 265.
[4] Docs. #276, 281, 285.
[5] This ruling refers throughout to "a jury or other factfinder at trial" in the event that one or more of the claims at issue are not subject to determination by a jury rather than by a judge—an issue I have no occasion to address at this stage.
[6] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.
[7] Doc. #274 at 5.

judgment.[8] But most of these points cover arguments that I rejected last time. The company has not offered a compelling reason to reconsider them. And I disagree with Express Scripts on the one new issue that it has raised. So I will deny the motion.

*Prior authorization in 2015*

Start with the new issue. It relates to Express Scripts' "prior authorization" policies. Not every drug covered by Henkel's plan was covered unconditionally. Some drugs were covered only if the patient met "specific clinical criteria."[9] Henkel hired Express Scripts to write these criteria. When a drug was covered by the criteria, Express Scripts was supposed to check the criteria before approving the drug. This process was called "prior authorization."[10]

Henkel alleges that Express Scripts failed to follow its own prior-authorization policies. Had it done so, Henkel claims, it would have realized that the two patients were not eligible for the expensive drugs and thus would have rejected their prescriptions. Express Scripts' first response to this claim is that before 2016 the angioedema drugs were not subject to prior authorization at all. Express Scripts wants summary judgment confirming this point.

I will not grant one. There is evidence that the angioedema drugs *were* subject to prior authorization as early as 2015. For example, in June 2015, Express Scripts sent Henkel a "Collaborative Planning Guide" presentation.[11] One slide discusses Express Scripts' "Utilization Management: Prior Authorization" policy.[12] The slide then lists fifteen drugs, including four of the six at issue here (Cinryze, Berinert, Firazyr, and Kalbitor).[13] The four drugs are highlighted in gray, and the bottom of the slide says: "Rules highlighted in gray are already implemented."[14]

---

[8] *Id.* at 6.
[9] Doc. #186 at 3 (¶¶ 3–5).
[10] *Ibid.*
[11] Doc. #275-12 at 2.
[12] *Id.* at 64.
[13] *Ibid.*; *see* Doc. #186 at 3 (¶ 6).
[14] Doc. #275-12 at 64.

This slide is open to several interpretations. The simplest is that the highlighted drugs already, by June 2015, needed prior authorization.

| Utilization Management:  Prior Authorization | | | | | | |
|---|---|---|---|---|---|---|
| Offering Name | Estimated Patients Flagged | Estimated Program Cost | Rebate Impact | Estimated Ingredient Cost Savings | Estimated Net Ingredient Cost Savings | Estimated Net Ingredient Cost Savings PMPM |
| Arcalyst | 0 | $0 | $0 | $0 | $0 | $0.00 |
| Chenodal | 0 | $0 | $0 | $0 | $0 | $0.00 |
| Cinryze, Berinert | 0 | $0 | $0 | $0 | $0 | $0.00 |
| Firazyr | 0 | $0 | $0 | $0 | $0 | $0.00 |
| Ilaris | 0 | $0 | $0 | $0 | $0 | $0.00 |
| Kalbitor | 0 | $0 | $0 | $0 | $0 | $0.00 |
| Korlym | 0 | $0 | $0 | $0 | $0 | $0.00 |
| Krystexxa | 0 | $0 | $0 | $0 | $0 | $0.00 |
| Kuvan | 0 | $0 | $0 | $0 | $0 | $0.00 |
| Macular Degeneration | 0 | $0 | $0 | $0 | $0 | $0.00 |
| Makena | 0 | $0 | $0 | $0 | $0 | $0.00 |
| Nplate | 0 | $0 | $0 | $0 | $0 | $0.00 |
| Promacta | 0 | $0 | $0 | $0 | $0 | $0.00 |
| Samsca | 0 | $0 | $0 | $0 | $0 | $0.00 |
| Xenazine | 0 | $0 | $0 | $0 | $0 | $0.00 |

Rules highlighted in gray are already implemented.

Rules from this list cannot be added individually; entire list must be implemented.

This view is supported by another slide in the 2015 presentation. The slide lists Firazyr in a table of "Top Specialty Drugs by Plan Cost."[15] Next to the drug, the slide says that Firazyr uses the "PA"—Prior Authorization—management strategy.[16]

Express Scripts reads these slides differently. It says that the "Utilization Management" slide had a formatting error. And it says that the "PA" next to Firazyr means only that prior authorization was *available* for the drug, not that the strategy was in place.[17] But a jury or other factfinder could disbelieve these arguments. Express Scripts has not put the issue beyond dispute to warrant summary judgment.

---

Next, Express Scripts argues that the drugs must not have been subject to prior authorization in 2015, because Henkel *added* prior-authorization coverage for them in 2016.[18] But that is not necessarily true. What Henkel added in 2016 was the "Proactive PA" package. This package covered twenty drugs, including some of the angioedema ones.[19] Yet even before Henkel added the full "Proactive" package, a "majority of [that package's] rules [we]re already implemented."[20]

Additionally, Express Scripts argues that under its contract with Henkel, it was not supposed to check a drug for prior authorization until there was a signed document from Henkel telling it to. But the contract does not say that. It says only that Henkel "will promptly furnish … [d]esignation, in writing, of those Plan Design features to be determined by [Henkel]."[21] Yet this just prompts the question: Was the prior-authorization policy one "of those Plan Design features" to be determined solely by Henkel? Express Scripts' own slides suggest that it was not. A jury or other factfinder should decide. I will thus deny summary judgment on whether prior authorization was required in 2015.

*Prior authorization after 2015*

Express Scripts concedes that the angioedema drugs needed prior authorization after 2015. And it authorized the drugs in 2016 and 2017. Its defense for these years is that it authorized the drugs correctly. It moves for summary judgment on two issues related to its policies. I have already ruled against Express Scripts on these points, and the company gives me no good reason to reconsider.

---

[18] Doc. #274 at 17-18; *see* Doc. #275-20 at 2, 7.
[19] *Ibid.*
[20] Doc. #275-12 at 45.
[21] Doc. #284-10 at 6.

*Type of evidence*. First, Express Scripts wants a summary judgment about the type of evidence that it could rely on to approve the drugs. Many of the clinical criteria were lab measures. For example, Firazyr could be approved if a patient's "level[ ] of functional C1-INH protein" was "<50% of normal."[22] To verify these criteria, Express Scripts spoke with the patients' doctors. The doctors verbally confirmed that the patients were eligible for the drugs. But Henkel says this was not enough: Express Scripts needed to demand hard copies of the lab results—which, Henkel says, would have revealed that the doctors were wrong and that the patients did not meet the criteria. Express Scripts disagrees and wants me to rule that it did not need to demand hard copies.

Last time around, I ruled against Express Scripts on this issue. I held that a "reasonable factfinder could conclude that, … in light of the extraordinarily high costs involved, [Express Scripts] had an obligation to confirm the [lab tests in writing]." *Henkel*, 2021 WL 2857503 at *9. The company's new arguments do not move the needle.

First, Express Scripts objects to my reasoning. When it approved the drugs, it says, it could not have known how expensive they would become. I disagree. While Express Scripts might not have known exactly how much the drugs would end up costing, it had a strong hint. It knew how much each dose cost. And by the time it approved the sixth drug in 2017, the treatment had already racked up over $10 million in costs.[23] A jury or other factfinder should decide whether Express Scripts needed to do more in light of these mounting costs.

Next, Express Scripts points out that in 2018, it changed its policies to expressly require hard proof.[24] Thus, it reasons, its policies must *not* have required hard proof before then. But at

---

[22] Doc. #186-1 at 3.
[23] Doc. #310 at 12 (¶ 28); Doc. #310-32 at 4.
[24] Doc. #275-24 at 2–3.

best, this shows that Express Scripts did not *think* it needed to demand hard proof before 2018. It might have been wrong. (For a similar reason, it is not informative that Henkel amended its own policies in 2017 to require hard proof.[25] Maybe Henkel was trying, in light of this dispute, to codify what it always thought was the rule.)

In addition, Express Scripts argues that requiring written proof would have been dangerous. It argues that if it had demanded proof, it would have delayed the approval of lifesaving medicine. But Express Scripts later decided to require documentation. So there is reason to doubt this excuse and why its validity is properly determined at trial.

*Grandfathering*. Even if patients did not meet the clinical criteria for a drug, they had a backdoor to get the drug approved. Under Express Scripts' policies, a drug could be automatically approved if the patient had taken it before. Express Scripts approved some of the angioedema drugs for this reason.[26] Henkel objects to that. It argues that Express Scripts was not allowed to authorize drugs based on prior use. In response, Express Scripts wants a summary judgment confirming that it was allowed to.

I have already denied Express Scripts summary judgment on this issue. As I explained, the parties signed a 2016 contract addendum that said: "Standard guarantees require the implementation of Prior Authorization rules without grandfathering."[27] One reasonable interpretation of this sentence, I ruled, was that "Express Scripts was barred from granting prior authorization merely on the basis of prior or current use of" a drug. *Henkel*, 2021 WL 2857503, at *8.

---

[25] Doc. #185-13 at 2.
[26] *See, e.g.*, Doc #186-1 at 4.
[27] Doc. #275-20 at 9.

Express Scripts does not like my conclusion, based mostly on arguments that I have rejected twice. *See Henkel*, 2021 WL 2857503, at *8.[28] It makes only one new argument: The 2016 addendum describes the no-grandfathering rule as a "standard guarantee." But the addendum also says that "Guarantee" was "Not Available" for the package that included the angioedema drugs.[29] According to Express Scripts, this means that the "no grandfathering" rule did not apply to those drugs.

| Proactive PA List - Full List Only | Fee - PMPM | Guarantee | In Place | Add | Remove | G'dfather | PreNotify | Cov Review |
|---|---|---|---|---|---|---|---|---|
| Proactive PA List - Full List Only | | | | | | | | |
| Arcalyst | | | | | | | | |
| Cinryze, Berinert | | | | | | | | |
| Chenodal | | | | | | | | |
| Firazyr | | | | | | | | |
| Ilaris | | | | | | | | |
| Kalbitor | | | | | | | | |
| Korlym | | | | | | | | |
| Krystexxa | $0.02 | Not Available | | ✗ | | | ✗ | EBI managed |
| Kuvan | | | | | | | | |
| Macular Degeneration (Eylea, Lucentis, Macugen) | | | | | | | | |
| Makena | | | | | | | | |
| Nplate | | | | | | | | |
| Pomacta | | | | | | | | |
| Ruconest | | | | | | | | |
| Samsca | | | | | | | | |
| Xenazine | | | | | | | | |

But this chart is hard to understand. Is "guarantee" the same thing as "standard guarantee"? And if Express Scripts is right, then why is the "G'dfather" column next to the package shaded out? This document is too murky to refute Henkel's claim. I will therefore deny summary judgment.

*Duty to reconsider approvals*

Under Express Scripts' policies, once it approved a drug, the authorization lasted for three years.[30] Thus, for each drug and patient, Express Scripts considered the clinical criteria at most once.[31] But there is evidence that after Express Scripts approved the angioedema drugs, it learned of new lab reports that contradicted the results it had relied on to approve the drugs. *See Henkel*, 2021 WL 2857503, at *11. According to Henkel, Express Scripts should have then

---

[28] *See also* Docs. #243, 265.
[29] Doc. #275-20 at 7.
[30] *See, e.g.*, Doc. #186-1 at 3.
[31] *See, e.g.*, Doc. #186 at 8 (¶ 23).

realized that the original readings were wrong and revoked its prior authorizations. Express Scripts disagrees and seeks a summary judgment confirming its position. I will not grant one.

First, Express Scripts argues that once it approved a drug, it could rely on that decision mechanically for the next three years—regardless of what else it learned—because no document expressly said otherwise. I have already considered and rejected this tenuous argument. *See ibid*.

The company also argues that even if it sometimes had to redo its authorizations, it did not have to do that here. The new lab results did not cast doubt on the old ones, it says, because lab readings can change over time. But Express Scripts points to no medical evidence that decisively confirms this theory. So a jury or other factfinder at trial should decide whether the discrepancies were fully explained by the passage of time, or whether they were a red flag.

Finally, Express Scripts argues that even if it had reconsidered whether to approve the drugs, it would have made the same decision. But given that the new lab reports conflicted with the company's own clinical criteria, this point is not beyond dispute.

*Drug utilization reviews*

Besides checking certain drugs for prior authorization, Express Scripts promised that before any drug was dispensed, it would "perform [a] standard drug utilization review."[32] This review was meant "to assist the dispensing pharmacist and prescribing physician in identifying potential drug interactions, incorrect prescriptions or dosages, and certain other circumstances that may be indicative of inappropriate prescription drug usage."[33]

Henkel claims that Express Scripts did not review the angioedema prescriptions adequately. The prescriptions were for extremely high dosages. For instance, one patient, instead

---

[32] Doc. #284-12 at 10.
[33] *Ibid*.

of taking the recommended 5 vials per week of a drug, took 66 vials *each day*.[34] Henkel claims

that if Express Scripts had done a proper drug utilization review, it would have balked at these

extreme dosages and blocked the prescriptions. Express Scripts disagrees and moves for

summary judgment on this issue. But I have already considered and rejected this request, and the

company has offered no compelling reason to reconsider. *See Henkel*, 2021 WL 2857503 at *12.

     This time, Express Scripts argues that "drug utilization reviews" are a limited check: all

they entail is sending a computer alert to Accredo when there might be a problem with the

prescription. And that's it, says Express Scripts—how the Accredo pharmacist *reacts* to the alert

is a medical decision and not part of the review.

     But I am not convinced that the reviews were necessarily meant to be that limited. True,

Express Scripts' expert witness, a pharmacist, agrees with the company's narrow definition of

"drug utilization review."[35] But there is conflicting evidence. For example, ReliaStar's expert

testified that drug utilization reviews are performed partly by "pharmacists … at the point of

dispensing."[36] And an Express Scripts witness admitted that "Drug Utilization Review … is a

very broad term."[37] In fact, the term covers not just "concurrent reviews" when a drug is

dispensed, but also "retrospective reviews" to monitor for long-term abuse.[38]

     Thus, a jury or other factfinder at trial could find that Express Scripts needed to do more

than send out an alert when the dosage was high; it also needed to respond to that alert

adequately. It is also a trial issue whether Express Scripts delegated that part of its duty to

---

[34] Doc. #335 at 4 (¶ 6).
[35] *See, e.g.*, Doc. #275-11 at 22–23.
[36] Doc. #275-21 at 6.
[37] Doc. #331-4 at 4.
[38] *See* Doc. #275-21 at 6; Doc. #306-65 at 8; Doc. #334 at 10.

Accredo. If so, then Express Scripts would be liable if Accredo did not respond properly to the alerts.[39]

And that might have happened. There is ample evidence that the prescriptions were inappropriate and that Accredo knew it. *See Henkel*, 2021 WL 2857503 at *12. For instance, an Accredo director thought that one of the patients' doctors was a "quack" who had a history of prescribing medicine "without lab[ ] support."[40] Other employees thought that the "meds obviously are not working."[41] And Express Scripts itself may have known about the conflicting lab results.

Express Scripts, of course, sees the facts differently. It claims that the patients really did have angioedema, that the dosages were proper, and that the drugs saved their lives.[42] But that is for a trial to decide amidst conflicting evidence, and so I will deny Express Scripts' motion for partial summary judgment.

### Henkel's motion for partial summary judgment

Henkel moves for summary judgment on two issues. First, it wants a judgment that Express Scripts was a fiduciary to its healthcare plan. With one uncontested exception, I will deny this part of the motion. Second, Henkel seeks a judgment about the standard by which Express Scripts' decisions should be reviewed. I agree with Henkel and will award it summary judgment on that issue.

### Fiduciary status

To win its ERISA claim, Henkel must prove that Express Scripts was a fiduciary to its healthcare plan. Henkel seeks summary judgment on this issue.

---

[39] Doc. #284-12 at 18; *see also Henkel*, 2021 WL 2857503 at *10.
[40] Doc. #332 at 11.
[41] *Id.* at 12.
[42] Doc. #274 at 7–14, 24–26.

It starts by arguing that I have already decided the point. It notes that when I ruled on its motion to dismiss, I said that "Express Scripts [is a] fiduciar[y] under the [healthcare] plan." *Henkel of Am. Inc. v. ReliaStar Life Ins. Co.*, 2020 WL 1430008, at *4 (D. Conn. 2020). But there, I was merely assuming an allegation from Henkel's complaint—as I must when deciding a motion to dismiss.[43] *See Smith v. Campbell*, 782 F.3d 93, 96 n.2 (2d Cir. 2015). I was not making an evidence-based finding on the merits.

Nor (as Henkel also argues) did Express Scripts concede that it was a fiduciary. True, in its motion to dismiss, Express Scripts cited cases involving "the conduct of a fiduciary."[44] But it never claimed that those cases involved identical facts. So Express Scripts has not waived its right to contest its fiduciary status.

And with one uncontested exception, a jury or other factfinder at trial could find that Express Scripts was not a fiduciary. Under ERISA, "a person is a fiduciary with respect to a plan to the extent … he exercises any discretionary authority or discretionary control respecting management …[or the] administration of such plan." 29 U.S.C. § 1002(21)(A). But "someone who performs purely ministerial functions for a benefit plan is not a fiduciary." *Blatt v. Marshall & Lassman*, 812 F.2d 810, 812 (2d Cir. 1987). And just because someone is a fiduciary for one purpose, that does not mean he is a fiduciary for all purposes. To recover for breach of fiduciary duty, the plaintiff must prove that the defendant "was acting as a fiduciary" specifically "when taking the action subject to complaint." *Pegram v. Herdrich*, 530 U.S. 211, 225–26 (2000). "Whether or not [the company] exercised discretion with respect to *other* aspects of Plan administration is immaterial." *In re Express Scripts/Anthem ERISA Litig.*, 285 F. Supp. 3d 655, 681 (S.D.N.Y. 2018) (emphasis added).

---

[43] *See* Doc. #51 at 11–12, 43 (¶¶ 46, 48, 52, 229).
[44] Doc. #61-1 at 12.

Here, Henkel is challenging Express Scripts' decision to authorize the angioedema drugs. Whether Express Scripts did that as a fiduciary is a "mixed question of law and fact." *LoPresti v. Terwilliger*, 126 F.3d 34, 39 (2d Cir. 1997). With one exception that Express Scripts concedes, there are too many fact questions to decide this issue now.

For five of the six drugs (all but Haegarda), there is a meaningful dispute over whether Express Scripts acted with discretion while approving them. Express Scripts claims that it authorized these drugs mechanically: It had a rigid checklist of clinical criteria.[45] It verified the criteria one by one. And when the drugs met the criteria, it approved them instantly.[46] Express Scripts asserts that this was *all* the company was authorized to do.[47] If a jury or other factfinder at trial credited this evidence, it could find that Express Scripts was not a fiduciary: As "[n]umerous courts have explained," when "a service provider or [pharmacy benefits manager] acts pursuant to the terms of a contract, it does not exercise discretionary authority and does not act as an ERISA fiduciary." *In re Express Scripts/Anthem*, 285 F. Supp. 3d at 679. This is true even if "application of [the] rules requires some interpretation." *Mortg. Lenders Network USA, Inc. v. CoreSource, Inc.*, 335 F. Supp. 2d 313, 321 (D. Conn. 2004).

The contracts between Express Scripts and Henkel further suggest that Express Scripts had little discretion. These contracts—with one exception that I will discuss later—state that Express Scripts would not be a fiduciary of the plan. And they say that *Henkel*, not Express Scripts, had "complete discretionary, binding, and final authority to construe the terms of the Plan."[48] To be sure, "a contractual disclaimer of a fiduciary relationship [is] not dispositive" because fiduciary status turns "on the function performed." *Id.* at 318; *Blatt*, 812 F.2d at 812. But

---

[45] *See, e.g.*, Doc. #186-1 at 3.
[46] *See, e.g.*, Doc. #186 at 8–9.
[47] Doc. #274 at 35-36.
[48] Doc. #284-10 at 19; *see* Doc. #284-12 at 15.

a disclaimer is still "relevant" to how the parties understood their roles. *CoreSource*, 335 F. Supp. 2d at 318.

Henkel's responses do not put this issue beyond dispute. First, Henkel claims that Express Scripts had discretion over the *content* of the prior-authorization policies. To the extent that is true, it does not help. Henkel is not challenging the content of the criteria; it is challenging Express Scripts' failure to follow them. (The one exception is that Henkel objects to the "grandfathering" rule. But Henkel's theory is that Express Scripts was *forbidden* from adopting this rule, not that Express Scripts had the discretion to adopt it but used that discretion poorly.)

Second, Henkel argues that Express Scripts is a fiduciary because it has "special expertise" in managing benefits. But this point is not decisive. Experts are not automatically fiduciaries; they are fiduciaries only if they have discretion. "The ordinary functions of consultants and advisers to employee benefit plans … may not be … fiduciary functions." *Gray v. Briggs*, 1998 WL 386177, at *3 (S.D.N.Y. 1998).

Third, Henkel argues that Express Scripts employees must have had discretion over whether to approve the drugs, because they debated the question. But most of Henkel's evidence is about deliberations at Accredo, the subsidiary. While Express Scripts might be liable for Accredo's actions, that is still an open question. And Henkel has offered no evidence that Express Scripts employees themselves deliberated over whether to approve the drugs.[49]

Finally, Henkel points to its contract with Express Scripts. Under the contract, Express Scripts "agree[d] that it shall be the appropriate named fiduciary in accordance with [29 C.F.R. §] 2560.503-1(h)."[50] This is the exception that I mentioned. But the exception is narrow. Section

---

[49] *See* Doc. #284-31 at 23; Doc. #274-21 at 5 (Henkel's evidence for this point, none of which necessarily involves discretion).
[50] Doc. #284-10 at 19.

2560.503-1(h) regulates the "[a]ppeal of adverse benefit determinations." So Henkel agreed to be a fiduciary for appeals only.

For five of the six drugs, however, there was no "adverse benefit determination" and no appeal. Express Scripts approved the drugs instantly, because (it says) its mechanical rules required it to do so. In these cases, the contract does not say that Express Scripts acted as a fiduciary.

The contract also says that Express Scripts had "authority and *discretion* solely to undertake administrative and/or clinical initial determinations, first-level, second-level and urgent appeals of claims eligibility and benefit applications."[51] According to Henkel, this language proves that Express Scripts had discretion over prior authorizations. But I am not so sure. The nouns "authority" and "discretion" do not necessarily pair with every item in the list that follows. Maybe "discretion" pairs with the "appeals," while "authority" pairs with the "determinations." The sentence leaves this question open.

I will thus deny summary judgment on five of the drugs. But one patient did not meet the clinical criteria for the drug Haegarda. So Express Scripts initially rejected her prescription. She appealed, however, and Express Scripts then waived the criteria and approved the drug.[52] In doing so, Express Scripts was plainly exercising discretion—a point it concedes.[53] Thus, when Express Scripts approved Haegarda for this patient, it was acting as a fiduciary. I will award Henkel summary judgment on this narrow point.

---

[51] *Ibid*. (emphasis added).
[52] Doc. #186 at 23–24.
[53] Doc. #294 at 37.

*Standard of review*

Next, Henkel moves for summary judgment against ReliaStar on the standard of review. ReliaStar agreed to cover Henkel's valid healthcare costs above a certain threshold. The costs for the drugs here blew past that threshold. So if the drugs were validly covered by Henkel's plan, ReliaStar might have to pay for them. The parties debate whether the drugs were covered. A jury or other factfinder at trial will need to decide that.

Before the trial, however, I must determine what standard of review applies. ReliaStar argues that the jury or factfinder should review the plan *de novo*: it should decide for itself whether the drugs were covered under the terms of Henkel's plan. Henkel does not agree. It argues that the jury or factfinder should review Express Scripts' approval of the drugs deferentially: as long as Henkel did not abuse its discretion in approving the drugs, then ReliaStar must pay, even if approval was not the absolute best decision.

I agree with Henkel. Henkel's healthcare plan gives it "all power, authority and *discretion* necessary … to construe and interpret the Plan, decide all questions of eligibility for benefits including factual determinations and determine the amount, manner and time of payment of any benefits under the Plan."[54]

Of course, ReliaStar is not bound by Henkel's plan; it is bound only by the policy it sold to Henkel (and background state or federal laws). In theory, Henkel could have bought a stop-loss policy that did not mirror the terms of its healthcare plan. But Henkel did not leave a gap in its coverage. Instead, it bargained for a "Plan Mirroring Coordination Endorsement." In the endorsement, ReliaStar promised that "We will reimburse You for payments … that are … [p]aid according to the terms of Your Employee Benefit Plan."[55]

---

[54] Doc. #284-1 at 39 (emphasis added).
[55] Doc. #284-6 at 18.

One of those terms is the clause giving discretion to Henkel to award benefits. And thus, as long as approving a benefit was not an abuse of discretion, the benefit was "paid according to the terms of [Henkel's] Plan," and ReliaStar must cover it.

The mirroring agreement does have five exceptions.[56] But none is relevant here. If the parties meant to reserve a sixth exception—for decisions that were defensible but not the best interpretation of the plan—they would have listed it. They did not.

Other courts, on similar facts, have endorsed using a deferential standard of review. In *Computer Aided Design Systems, Inc. v. Safeco Life Insurance Co.*, 358 F. 3d 1011 (8th Cir. 2004), an insurer agreed to reimburse a company for some of the "expenses you have paid for covered persons under your plan." The plan, in turn, gave the company "the exclusive authority to decide whether to grant or deny claims, reviewable only for an abuse of discretion." *Id.* at 1012–13. Given this language, the court ruled that the insurer had to reimburse the company unless the company had abused its discretion in awarding benefits.

A similar case is *Zurich North America v. Matrix Service Inc.*, 426 F.3d 1281 (10th Cir. 2005). The insurer agreed to reimburse a company for costs "covered under [its] Plan of Benefits." *Id.* at 1284. Because that plan gave the company "the sole discretionary authority to determine eligibility for plan benefits or to construe the terms of the plan," the court deferred to the company's interpretation of the plan. *Id.* at 1288.

ReliaStar argues that its policy with Henkel has unique language that changes the result. I do not agree. To start, ReliaStar points out that in the mirroring endorsement it promised to "reimburse [Henkel]" only "Upon receipt of Proof of Loss acceptable to Us."[57] This sentence, ReliaStar argues, means that it was reserving the right to second-guess Henkel's approvals.

---

[56] *Ibid.*
[57] *Ibid.*

Not so. This sentence evokes another part of the contract, the "Proof of Loss" clause. It says: "You or the Claim Administrator must request payment and provide complete and accurate Proof of Loss, in form and content acceptable to Us."[58] This clause explains how Henkel must notify ReliaStar of its claims. It is not about the substantive standard for approving a claim. If the parties meant to include a substantive limit on coverage, they would have put it with the endorsement's five exceptions. They would not have snuck it into a clause about the procedure for filing a claim.

ReliaStar cites a few other contract terms that it thinks help its argument. But these terms are from the main policy, not the mirroring endorsement. And the endorsement says that "[i]n the event of a conflict between … this Endorsement and the … Policy, this Endorsement will control."[59] So even if this other language helped ReliaStar, it would be preempted.

ReliaStar's remaining arguments are not about the contract language and not persuasive. First, it warns that under Henkel's interpretation, Henkel could saddle it with "random[ ]" expenses.[60] But ReliaStar can still challenge Henkel's decisions for abuse of discretion. If it thought that this check was not enough, it should not have agreed to mirror Henkel's coverage decisions.

Second, ReliaStar points out that this case is not a typical ERISA suit in which a patient is suing her employer for benefits. And thus, it says, the jury or other factfinder at trial should not use the deferential standard of review that courts use in normal ERISA cases. But I am not imposing a deferential standard *because* that is the standard in normal ERISA cases. I am imposing it because that is the standard ReliaStar agreed to.

---

[58] *Id.* at 10.
[59] *Id.* at 18.
[60] Doc. #302 at 31.

Third, ReliaStar argues that because "[Express Scripts'] decisions were so fundamentally flawed," they do not deserve deference.[61] But this puts the cart before the horse. The standard of review determines whether Express Scripts' decisions were valid—not the other way around.

Finally, ReliaStar argues that picking a standard of review would be premature. After all, Express Scripts has argued that some of its actions were mandatory. According to ReliaStar, I cannot pick a standard of review until the jury or other factfinder at trial decides whether Express Scripts is right. I do not agree. By the terms of its plan, Henkel could retain discretion or delegate it in whole or in part to Express Scripts.[62] Reliastar's plan mirroring coordination endorsement imports both possibilities. Whether Henkel chose the latter route does not change the standard of review this Court should apply to the issue of whether Henkel had discretion in the first place and in accordance with what Henkel and ReliaStar agreed in the stop-loss policy.[63]

I will therefore grant summary judgment to Henkel on the standard of review. For purposes of Reliastar's coverage obligations, payments that were made under the plan should be reviewed for abuse of discretion.

### ReliaStar's motion for partial summary judgment

ReliaStar moves for summary judgment on three issues. First, it argues that Henkel's declaratory claim (Count II) is redundant. Henkel agrees and has dropped the claim.[64] I will dismiss it.

Second, ReliaStar objects that Henkel has brought one count under CUIPA and a separate count under CUTPA. CUIPA is enforceable through CUTPA. But "CUIPA provides the exclusive and comprehensive source of public policy with respect to general insurance

---

[61] *Id.* at 33.
[62] Doc. #284-1 at 38.
[63] It may, at most, change which party's decisions this Court evaluates under this standard.
[64] Doc. #291 at 17–18 n.69.

practices." *State v. Acordia, Inc.*, 73 A. 3d 711, 732 (Conn. 2013). Thus, the standalone CUTPA

claim (Count IV) is redundant of the CUIPA claim. I will dismiss it too.

Finally, ReliaStar moves for summary judgment on the CUIPA claim. I will grant this

request in part. CUIPA forbids "[m]aking, issuing or circulating … any estimate, illustration,

circular or statement, sales presentation, omission or comparison which: … [m]isrepresents the

benefits, advantages, conditions or terms of any insurance policy." Conn. Gen. Stat. § 38a-

816(1). To win its CUIPA claim, Henkel must prove that ReliaStar "made a misrepresentation of

fact" that ReliaStar "knew or should have known was false," and that Henkel "reasonably relied

on the misrepresentation" and "suffered pecuniary harm as a result." *Nazami v. Patrons Mut. Ins.

Co.*, 910 A.2d 209, 213 (Conn. 2006).

Henkel claims that ReliaStar made a false statement in late 2016, when the insurer was

trying to get Henkel to renew its policy for 2017. By then, ReliaStar had covered the 2015

claims.[65] It had not given Henkel an answer on the 2016 claims. But it knew that the drugs were

getting more expensive. For example, in November 2016, a ReliaStar underwriter complained to

a colleague about "a woman at $5.4 million for a drug for hereditary angioedema."[66]

According to Henkel, ReliaStar used these rising costs to justify a rate hike for 2017.

Henkel does not have direct evidence of what ReliaStar said. But there is indirect evidence from

Mercer, a consulting firm that helped Henkel negotiate with ReliaStar. According to a Mercer

witness, "[p]art of the reason or justification for the maximum rate increase given to Henkel by

[ReliaStar] for 1/1/17 was, in fact, that there were ongoing claimants, including … the

[angioedema] claimants."[67] This testimony is supported by Mercer's 2016 records. In November,

---

[65] Doc. #160 at 34 (¶ 111).
[66] Doc. #293-14 at 3.
[67] Doc. #293-18 at 6.

a Mercer consultant emailed a Henkel employee about renewing the insurance. She told her that ReliaStar "[w]as proposing a +40% [rate hike] for 2017 due to recent large claim activity," including "$4.4M in Rx claims for two Hereditary Angioedema (HAE) cases that are expected to continue."[68]

If ReliaStar blamed its rate hike on the angioedema drugs, a jury or other factfinder at trial could find that the insurer was representing that the policy covered those drugs. But ReliaStar now argues that the policy never covered the drugs. If that proves true, then ReliaStar may have made a false statement in 2016. To be sure, ReliaStar was not necessarily promising in 2016 that it would cover *all* future prescriptions for the two patients. But at a minimum, a jury or other factfinder could find that it was promising that it would cover claims like the ones it already knew about.

Henkel must also prove that ReliaStar knew or should have known that its statements were false. This is also an issue most appropriate for trial. True, there is no evidence that ReliaStar *knew* its 2016 statements were false; it decided to reject the claims only later. But a jury or other factfinder could find that ReliaStar *should* have known that its statements were false. If ReliaStar is now right that it does not need to cover the drugs, perhaps it should have realized that before citing the cost of the drugs to justify a 40% rate hike.

Finally, there is a genuine fact issue to show that Henkel may have lost money in reliance on ReliaStar's statements. Henkel ended up renewing its insurance. Mercer had urged it to, pointing out that Henkel needed insurance for its "ongoing large claimants."[69] If ReliaStar had not said that the insurance would cover the "large claimants," then Henkel might have not renewed the insurance or might have demanded a lower rate.

---

[68] Doc. #293-19 at 2.
[69] *Id.* at 14.

So a jury or other factfinder should decide whether ReliaStar violated CUIPA in 2016 by misrepresenting the coverage of its 2017 offer. But I will limit Henkel's claim to this theory. Although Henkel claims that ReliaStar made three other false statements, it has offered no evidence to support these other theories.

First, Henkel claims that ReliaStar also tricked it into renewing its policy for 2016. But Henkel does not point to any false statement from a year earlier. It notes that ReliaStar thought "internally" that the renewed 2016 policy would cover the drugs.[70] But there is no evidence that ReliaStar shared this thinking with Henkel. Henkel also suggests that ReliaStar acted deceptively simply by approving the claims in 2015. But it offers no evidence that it reasonably believed, based on the approvals alone, that ReliaStar was promising to approve the drugs forever.

Second, Henkel claims that ReliaStar misrepresented the terms on which Henkel could renew its insurance policy. But Henkel does not point to any representation—let alone a misrepresentation—that ReliaStar made on this topic. Henkel cites only the insurance policy itself, which it claims ReliaStar later breached. But an insurance "[p]olicy cannot misrepresent itself." *W. World Ins. Co. v. Architectural Builders of Westport, LLC*, 520 F. Supp. 2d 408, 412 (D. Conn. 2007).

Third, Henkel claims that "ReliaStar misrepresented the bases on which the claims could be excluded under its Policy."[71] According to Henkel, ReliaStar could not exclude drugs from reimbursement simply because the drugs were experimental. Yet ReliaStar later refused coverage on that ground.[72]

---

[70] Doc. #291 at 20.
[71] *Id.* at 25.
[72] Doc. #280-6 at 2.

23

But again, there was no misrepresentation that Henkel relied on. If ReliaStar disobeyed

its own policy, Henkel may have a claim for breach of contract. There is no evidence that

ReliaStar misdescribed the policy to get Henkel to buy it. I will thus limit Henkel's CUIPA claim

to covering ReliaStar's statements in late 2016 about the 2017 policy.

### CONCLUSION

For the reasons set forth above, the Court DENIES the motion of Express Scripts for

partial summary judgment (Doc. #276). The Court GRANTS in part and DENIES in part the

motion of Henkel for partial summary judgment (Doc. #285). I award Henkel summary

judgment on two points. First, the decision to approve the drugs will be reviewed for abuse of

discretion for purposes of determining ReliaStar's coverage obligations. And second, Express

Scripts was acting as a fiduciary when it approved the prescription for Haegarda that was subject

to an appeal. The Court GRANTS in part and DENIES in part the motion of ReliaStar for

summary judgment (Doc. #281). Counts Two and Four are dismissed, and Count Three is limited

to the theory that ReliaStar misrepresented in 2016 whether the 2017 stop-loss insurance policy

would cover the drugs.

It is so ordered.

Dated at New Haven this 7th day of February 2023.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge